THE STATE OF OHIO, APPELLEE, *v.* WHITE, APPELLANT.

[Cite as State v. White, 15 Ohio St. 2d 146.]

(No. 41142—Decided July 10, 1968.)

Mr. *John T. Corrigan*, prosecuting attorney, and Mr. *Leo M. Spellacy*, for appellee.

Mr. *James R. Willis* and Mr. *Edward R. Brown*, for appellant.

## I.

SCHNEIDER, J. Upon consideration of the conflicting testimony in the record, we subscribe to the finding of the trial court that defendant's oral confession preceded public defender Frank Petrancek's request to see the defendant and any inducement on the part of Dorothy Berts and the police to obtain the oral confession. Furthermore, there is no corroborating evidence supporting defendant's contention that his request for the assistance of counsel was denied. (Cf. *Escobedo* v. *Illinois*, 378 U. S. 478, 481, 12 L. Ed. 2d 977, where the police denied petitioner's request to see counsel, denied counsel's request to see petitioner, and told petitioner that his lawyer " 'didn't want to see' him. The testimony of the police officers confirmed these accounts in substantial detail.") Finally, his voluntary appearance belies any intention on his part to seek an attorney prior to his interrogation. If he had desired the assistance of counsel, he had four days to procure it before he surrendered and made his statement.

The only remaining question regarding the admissibility of defendant's statements is whether the warning received by him met the constitutional standards imposed by the *Escobedo-Carder* rule.

"Two elements of the rule in relation to in custody interrogation prescribed by *Escobedo* are, one, the person being interrogated must request and be denied the right to consult with counsel, and, two, the interrogators must have failed to effectively warn him of his absolute constitutional right to remain silent." *State* v. *Carder*, 9 Ohio St. 2d 1, paragraph three of the syllabus.

Because the trial of this case occurred after *Escobedo*, *supra*, but prior to *Miranda* v. *Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, it "is subject only to the specific rules in relation to counsel during in custody interrogation prescribed by *Escobedo*." *State* v. *Carder*, *supra*, paragraph two of the syllabus. See also *Johnson* v. *New Jersey*, 384 U. S. 719, 16 L. Ed. 2d 882. The requirements of *Miranda*, how-

ever, although not directly applicable, are relevant on the issue of voluntariness. *Davis* v. *North Carolina,* 384 U. S. 737, 16 L. Ed. 2d 895, and *Clewis* v. *Texas,* 386 U. S. 707, 18 L. Ed. 2d 423.

Defendant turned himself in at the police station on Saturday, October 24, at 10:30 p. m. He waited approximately half an hour for interrogating officers, detectives Moss and Hospodar, to arrive. At 3:15 a. m., approximately four and one-half hours later, defendant signed a written statement. The only warning he received prior to his interrogation was the following:

"Kenneth James White: You are arrested and may be charged with the crime of murder and the law gives you the right to make a statement which may be used against you at the time of your trial in court. Understanding this do you care to make a statement telling the truth about the facts that led to your arrest?"

The Court of Appeals found that the warning included in the statement, when considered in the light of other testimony, was sufficient. We agree. Defendant knew that he had already been placed at the scene of the crime by Dorothy Berts in a police interview on the preceding day. With knowledge of her incriminating statement, he went voluntarily to the police station to make a statement to protect himself and incriminate Leon Samuels. Defendant, while denying any knowledge of Samuels' plans, stated that Samuels fired the fatal shots and took the money. Under those facts defendant would be guilty of neither a deliberate premeditated murder, nor a felony murder directly or as an aider and abettor.

We hold that under the totality of the circumstances the warning was not violative of the constitutional standards required by the *Escobedo-Carder rule.* By warning defendant that the statement "may be used against . . . [him] at the time of . . . [his] trial," and then asking him whether he cared to make a statement, the police conveyed the idea that whether he wished to make a statement was

up to him. The form of the warning is inconsequential; certainly there are no magic words necessary to make it effective.

We hold further that the warning preceding defendant's oral admission met the requisites of the rule. At 10:30 a. m. Monday, detective Fishbach brought the defendant from his cell to the statement room, at which time, the detective testified:

"He recognized me and I again told him that we were going to take him to the statement unit and if he wanted to, he could either add or detract or not say anything. It was entirely up to him."

Further testimony of the witness Fishbach follows:

"Q. Now, officer, would you tell us what, if anything, took place when you confronted the defendant, Kenneth White, with Leon Samuels? A. Mr. White had been sitting. He rose to his feet, stretched out his hand and shook hand with Leon Samuels.

"He said, 'Man, I'm sorry. I'm sorry I got you into this. I'm the one that shot the cab driver.'

"Q. What did Samuels say? A. Samuels turned to O'Hara and I, and was still crying, and said, 'See, I told you I did not shoot the cab driver.' "

This admission was made in the face of the prior warnings and was not precipitated by any accusation on the part of Samuels. The trial court, therefore, properly considered the statements in question.

## II.

Defendant urges that the prosecution's use of evidence of the deceased's background and reliance upon such evidence in its argument for the death penalty over the objection of defendant constituted reversible error. The general rule is stated as follows:

"Except perhaps where the evidence of the homicide is entirely circumstantial, it is not permissible for the state in the first instance, and before the character of deceased has been assailed, to offer primary evidence or evidence in chief of deceased's good character or reputation as a quiet,

peaceable, and law-abiding man.'' 40 Corpus Juris Secundum 1138, Homicide, Section 222.

''In most cases evidence concerning the family left by the deceased is inadmissible.'' 40 Corpus Juris Secundum 1146, Homicide, Section 225. See, also, 26 American Jurisprudence 367, Homicide, Section 314, and annotation, Admissibility and propriety, in homicide prosecution, of evidence as to deceased's spouse and children, 67 A. L. R. 2d 731.

Such evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused and the penalty to be imposed. The principal reason for the prejudicial effect is that it serves to inflame the passion of the jury with evidence collateral to the principal issue at bar. Although the admission and subsequent argument with the use of this testimony may very well have constituted prejudicial error before a jury, we do not believe that defendant was prejudiced before a three-judge court under the facts in the instant case. Defendant cites no cases to the contrary.

There was ample evidence in the record to sustain the verdict. The gun had been fired twice at close range to the victim's head. Additionally, defendant, a psychopathic deviate with a narcissistic personality, was quoted as saying, ''that he wished he [the cab driver] was dead so he couldn't identify him.'' It does not affirmatively appear that the court considered the evidence in question in arriving at its verdict. We indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary. *People* v. *Smith*, 55 Ill. App. 2d 480, 204 N. E. 2d 577.

### III.

The major question left for consideration is the identity of the triggerman. In this case, had defendant remained silent, there would be no evidence beyond a reasonable doubt and hence no conviction. No one who saw the

act testified. The only evidence implicating defendant as the triggerman consists of his aforementioned confessions during the police interrogation and the admissions and denials to his "friends" after he had consumed a substantial amount of liquor.

The state's principal witness was Dorothy Berts, defendant's paramour. She testified that defendant stated to her shortly after Ernest William's death that he had just shot a man. She also testified that Leon Samuels admitted to her that he had shot the cab driver. Upon cross-examination, the following colloquy occurred:

"Q. In fact, the first time Kenneth said anything to you, Miss Berts, about having shot the cab driver was after the police had told him that it would go better with you if he confessed; isn't that right?  A. Yes, that's the first time he came right out and said it.

"Q.  That is the first time that he came right out and said that he had shot anybody?  A. Yes.

"Q.  Then you are telling us that when he told you Tuesday morning that he had shot someone that he did not use those precise words?  A. I'm not quite sure what words exactly he used because I was upset.

"Q.  But whatever words he used, he did not come out and say, as you have just testified, that he had shot anyone, did he?  A. No, he didn't come right out and say it.

"Q. You assumed that he had shot someone?  A. Yes.

"Q. But when Leon Chambers [sic] told you at the Colonial Garden that night, Friday after you had been down to the police station, that he shot the cab driver, you believed him, didn't you?  A. Yes.

"Q.  And when you told the police that Leon Samuels shot the cab driver Friday, before you saw him at the Colonial Garden, you believed then that he had shot the cab driver, didn't you?  A. Yes."

Upon resumption of the cross-examination following a noon recess Dorothy Berts changed her story.

"A.  They told him that they couldn't promise him

anything, but if he told the truth that it would go easier with me.

"Q. It would go easier with you, is that right? A. Yes.

"Q. And that is the first time that you ever heard Kenneth White say to anybody, isn't it, Miss Berts, that he shot the cab driver? A. No.

"Q. Didn't you tell us earlier this morning that that was the first time that you had heard Kenneth White say that he had shot the cab driver? A. Yes. That's what I asked to see the prosecutors about."

On redirect examination Dorothy Berts reiterated her new version of the crucial events.

"Now, Miss Berts, was it the first time that you heard Kenneth say that he shot the taxicab driver when you were in the police station?

"Mr. Willis: Your Honor, I am going to object to that question. I think that the best evidence of when she told the police anything about Kenneth having said he shot the cab driver would be contained in the statements and rather than have Miss Berts give us another version, I think that we ought to be permitted an inspection of the same.

"The Court: Overruled.

"(The question was read.)

"A. No.

"Q. When was the first time you heard Kenneth say that he had shot the cab driver? A. At Johnny's house.

"Q. What did he say at that time? A. I asked him what was the matter. He said, 'I just shot a man.'

"Q. Did you hear him say it again? A. Yes.

"Q. When was the second time you heard Kenneth say he'd shot the cab driver? A. He said it to Pat Turner.

"Q. When did he say it to Pat Turner and where? A. It was Tuesday or Wednesday and it was at his mother's house."

Dorothy Berts made four statements to the police. She made an oral statement on Friday, October 23, two

written statements on Sunday, October 25, and a written statement on Monday, October 26. In her first three statements she told them that Leon Samuels was the person who had admitted that he shot the cab driver. In the fourth statement she indicated that defendant was responsible. Furthermore, on cross-examination, she admitted that she had recently told a Mr. Young from the public defender's office that the first time she heard defendant say that he shot the cab driver was after he had asked the police if they would let her go.

It is critical to ascertain when Dorothy Berts first heard defendant say that he shot the cab driver. Did she first hear his admission at Johnny Burke's house on the night of the killing, or six days later during the police interrogation? If she heard the confession at the police station, was it before or after the effort to induce a statement from him? The state's case is certainly stronger if she heard it directly from him and not only during the custodial interrogation. The court undoubtedly believed that the defendant admitted to her on the night of the killing that he was the triggerman because this version of her testimony was corroborated by the testimony of Johnny Burke and Pat Turner.

Counsel for defendant, after establishing that the statements of Dorothy Berts to the police were not only inconsistent with each other, but also with her testimony in court, requested that the court require the prosecutor to make them available for their examination and use. In addition, counsel sought the written statements of Johnny Burke and Pat Turner. The court denied each of these requests.

The rule in Ohio is clearly set forth in paragraph one of the syllabus of *State* v. *Rhoads*, 81 Ohio St. 397:

"Where a person conducts a private interview with one who afterwards is called and examined as a witness before the grand jury, which found an indictment against the defendant concerning some matters disclosed in said interview, which interview was stenographically taken, written out and subsequently delivered to the prosecuting attorney

for his use, and on the trial the person interviewed is called, and testified for the state in support of the indictment, it is error for the court, on request of defendant, to order the prosecuting attorney to deliver the transcript of said interview to defendant or his counsel, or to order the prosecuting attorney to allow either of them an inspection of the same.''

This court later distinguished between the reading of the defendant's statement as grounds for possible impeachment of defendant and a mere reference to a statement of a prosecuting witness by the state to frame questions of its own witness on direct examination. In the former case, it would be the duty of the trial court to submit the written confession to defense counsel for inspection upon his demand, while in the latter case it would be error. *State* v. *Sharp*, 162 Ohio St. 173, 182-183. Therefore, the trial court in the instant case could not comply with defendant's request even if it had desired to do so because of the existing Ohio law.

The reasons for the right of a defendant in a criminal case to inspect a statement of the prosecuting witness vary from the recognition that it is a procedural safeguard against the suppression of evidence material and capable of exculpating the accused to the idea that it provides additional material for impeaching the credibility of the prosecuting witness.

''. . . [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'' *Brady* v. *Maryland*, 373 U. S. 83, 87, 10 L. Ed. 2d 215. See *McMullen* v. *Maxwell*, 3 Ohio St. 2d 160.

The difficulty with the *Brady* rule is that it is not self-implementing. In cases involving its application, the exculpatory evidence has come to light through further investigation or the belated generosity of the prosecution. For the rule to be fully effective defendant would have to be clairvoyant. Otherwise, how would he know of the suppressed evidence?

In the federal courts, a defendant is entitled to a court order directing the government to produce for his inspection documents containing statements made by government witnesses relating to the events and activities about which these witnesses testified at the trial, without a prior determination of their relevancy and materiality by the judge. *Jencks* v. *United States*, 353 U. S. 657, 1 L. Ed. 2d 1103; Section 3500, Title 18 U. S. Code Section 3500 (the Jencks Act).

The court, at pages 667 and 668, reasoned:

"Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.

"Requiring the accused first to show conflict between the reports and the testimony is actually to deny the accused evidence relevant and material to his defense. The occasion for determining a conflict cannot arise until after the witness has testified, and unless he admits conflict, as in *Gordon*, the accused is helpless to know or discover conflict without inspecting the reports. A requirement of a showing of conflict would be clearly incompatible with our standards for the administration of criminal justice in the federal courts and must therefore be rejected. For the interest of the United States in a criminal prosecution '. . . is not that it shall win a case, but that justice shall be done. . . .' *Berger* v. *United States*, 295 U. S. 78, 88."

The *Jencks case* represents the right of the Supreme Court of the United States to exercise power in the absence of statutory provision to prescribe procedures for the administration of justice in the federal courts. Therefore, its holding is not binding upon state courts. *Palermo* v. *United States*, 360 U. S. 343, 345, 3 L. Ed. 2d 1287. It should not

be overlooked, however, that four members of the court in *Palermo* believed that the constitutional commands for compulsory process to obtain witnesses for the defense were close to the surface of the decision in *Jencks*. The court recently avoided answering the question "whether the prosecution's constitutional duty to disclose extends to all evidence admissible and useful to the defense and the degree of prejudice which must be shown to make necessary a new trial." *Giles* v. *Maryland*, 386 U. S. 66, 74, 17 L. Ed. 2d 737. The court had just denied a petition for writ of certiorari to the Supreme Court of Indiana in a decision recognizing that ordinarily a defendant is not entitled to an inspection of a statement of a prosecution witness. *Noel* v. *State* (Ind.), 215 N. E. 2d 539, certiorari denied, 385 U. S. 934, 17 L. Ed. 2d 214.

In looking at other jurisdictions, we find them almost equally divided on the question. See annotation, Right of Defendant in Criminal Case to Inspection of Statement of Prosecution's Witness for Purposes of Cross-Examination or Impeachment, 7 A. L. R. 3d 181. In accord with federal procedure, many states do not require a preliminary showing of inconsistency between the contents of the statement and the testimony of the witness at the trial. Id., 225. Others require such a preliminary showing of inconsistency which is essentially impracticable if not impossible. If the defendant does not know of the existence of the evidence or the inconsistencies which it contains, he would not be able to request its production.

There is, however, another alternative. The defense may request an *in camera* inspection by the court to determine the existence of any inconsistencies.

By an *in camera* inspection, we mean a review by the court at which counsel for the state and counsel for the defense are present and participating. If the judge determines that inconsistencies exist between the testimony of the witness and his prior statement, and such inconsistencies are of so substantial a nature that the demands of a fair trial and due process require that the defense be permitted to cross-examine the witness as to such inconsistency, the

statement should be released to defense counsel. Otherwise, defense counsel is bound under obligation of his oath of office as an attorney to erase from his mind, and never to use, any information received from the *in camera* inspection.

The instant case is analogous to *People* v. *Chapman,* 52 Cal. 2d 95, 338 P. 2d 428, where the Supreme Court of California said, at page 99:

"It was error to deny the motion for the production of Gloria's statement, and the error was clearly prejudicial. Her testimony was the principal evidence in support of one of the convictions and the sole evidence in support of the remaining convictions. Moreover, on cross-examination she admitted that she would lie or tell the truth depending on what suited her requirements at the time, and there was evidence that she had been careless with the truth on a number of occasions. In these circumstances there can be no question of the importance to the defense of obtaining her statement."

We hold that defense counsel were entitled to inspect, under the procedure hereinabove outlined, the written statements of Dorothy Berts, and that the trial court erred in not allowing such inspection. Paragraph one of the syllabus of *State* v. *Rhoads, supra* (81 Ohio St. 397), is hereby overruled. Because of the vital nature of her testimony to the state's case, any further light that these statements may shed on the facts and her credibility will indeed be crucial in the final disposition of this case. We therefore reverse the judgment and remand the cause to the Court of Common Pleas for a hearing on defendant's motion to inspect. At this hearing the court should also grant a request by defense counsel, if one is made, for inspection of the oral statement of Dorothy Berts if the police have a near verbatim account of it. Further, the court should grant defendant's request for an *in camera* inspection of the written statements of Pat Turner and Johnny Burke. The court may then determine whether any inconsistencies exist between the statements and the testimony.

Finally, if the court finds that such variations prohibited defendant from receiving a fair trial and denied him due process of law, it should order a new trial. If, on the other hand, the court decides to reaffirm its former judgment, a new judgment should be entered upon the verdict of guilty. Authority for this type of limited reversal, under similar facts, may be found in *State* v. *Richards*, 21 Wis. 2d 622, 124 N. W. 2d 684.

## IV.

Defendant also asserts error in the denial of his motion for pretrial discovery of defendants written and oral statements. Defendant was not prejudiced by such ruling since he had an adequate opportunity to inspect the statements at the hearing on the motion to suppress. He received a full and complete hearing on their voluntariness and nothing in the record indicates that prior disclosure would have had any bearing on the outcome. The denial by a state of an opportunity for defense counsel to inspect his client's confession does not constitute a violation of due process in the absence of a showing of prejudice. *Cicenia* v. *Lagay*, 357 U. S. 504, 2 L. Ed. 2d 1523; *Leland* v. *Oregon*, 343 U. S. 790, 96 L. Ed. 1302.

The Ohio rule has been stated as follows:

"Prior to the trial of a criminal case a court may properly refuse an application by defendant or his attorney to require a prosecuting attorney to submit for his inspection and examination a statement made by the defendant respecting the crime involved, reduced to writing and in the possession of the prosecuting attorney." *State* v. *Corkran*, 3 Ohio St. 2d 125, paragraph one of the syllabus. See, also, *State* v. *Sharp*, 162 Ohio St. 173, and *State* v. *Yeoman*, 112 Ohio St. 214.

*Judgment reversed.*

TAFT, C. J., MATTHIAS, O'NEILL, HERBERT and BROWN, JJ., concur.

ZIMMERMAN, J., concurs in paragraphs one and two of the syllabus but dissents from the judgment.