OPINION
Michael Anthony Brock appeals the judgment of the Auglaize County Court of Common Pleas finding him guilty of Murder, Corruption of a Minor, and Possession of Criminal Tools.
On Friday, November 15, 1996, the parents of 15-year old Amber Nicole Williams reported her missing. Ms. Williams had last been seen at around 8:30 p.m. on November 14 in "uptown" St. Marys, and was missing for nearly two weeks. However, on November 27, 1996, her body was found by a farmer in a wooded area off the north end of Koenig Road in rural Auglaize County. Officers who arrived on the scene later noted that it appeared Ms. Williams's body had been dragged to that area. The victim's body had a gaping gash wound on the neck that exposed muscles and an artery. The body was frozen to the ground, and the soil underneath appeared to be soaked with blood.
An autopsy later revealed that in addition to the fatal neck wound, Ms. Williams had a small stab wound on her neck that was consistent with a knife being held to her throat. Ms. Williams had also suffered a blow to the head and a post-death stab wound to her chest. Evidence was collected from the scene and from Ms. Williams' body, and it was determined that her vaginal vault contained semen. A sample of the semen and a hair retrieved from Ms. Williams' left hand were sent along with other samples taken during the autopsy to the Ohio Bureau of Criminal Investigation for analysis, and were subsequently forwarded to Lab Corp. of America for DNA testing.
The Auglaize County Sheriff's Office opened an investigation into Ms. Williams' death and questioned several individuals about her homicide. On November 29, 1996, Detective Sergeant Dennis White interviewed the defendant, who admitted that he had seen Ms. Williams on the evening of November 13 at the parking lot of a Burger King restaurant in St. Marys. Defendant claimed that he had seen Ms. Williams only one time previous to that night, but admitted that on that occasion "somebody mentioned something about Shane Irish and her was supposed to be doing something. He got locked up for the same thing * * * I was up for, corruption of a minor." Transcript at *602. The defendant had previously served an eighteen-month prison term for corruption of a minor, and Ms. Williams had been the victim-witness in the prosecution of another man, Shane Irish, for that same offense. Several witnesses later testified that at some point during the encounter at the Burger King, the defendant was heard describing Ms. Williams as "trouble." However, defendant maintained that he was home sick the evening of Thursday, November 14.
Nearly seven months after the defendant's initial interview, St. Marys Police Sergeant Lawrence Schieltz responded to an unrelated criminal damaging complaint at the defendant's residence. Sgt. Schieltz had previously been informed that the Auglaize County Sheriff's office was interested in obtaining a sample of the defendant's DNA, and after he had finished investigating the criminal damaging complaint, he managed to retrieve the butt of a cigarette that had been smoked by the defendant. This cigarette butt was forwarded to Lab Corp. of America, and testing revealed that the DNA obtained from the cigarette matched the DNA of the semen retrieved from Ms. Williams' body, and was similar to DNA obtained from the hair that was retrieved from Ms. Williams' left hand.
After the results of this DNA analysis were received by the Auglaize County Sheriff's Office, Detective Sergeant Dennis White interviewed the defendant a second time. Defendant again indicated that he had been home sick on the evening of Thursday, November 14, 1996, and that he had met Ms. Williams for the first time on Wednesday, November 13, 1996 at the Burger King Parking lot. During the interview, Detective White obtained a new DNA swab from the defendant, and then confronted him with the results of the previous DNA test. Despite those results, defendant denied that he had killed Ms. Williams and specifically denied having sex with her. However, testing performed on the second DNA sample taken from Mr. Brock confirmed the results of the earlier test.
Defendant was indicted by the Auglaize County Grand Jury in April 1999 for Aggravated Murder with a Death Specification, two counts of Kidnapping, Corruption of a Minor, Murder, and Possession of Criminal Tools. Defendant elected to proceed to trial to a three-judge panel, and trial commenced on March 20, 2000. At trial, multiple witnesses testified that the defendant knew Amber Nicole Williams prior to November 13, 1996, and the State also presented testimony that defendant had been seen driving Ms. Williams around St. Marys in the weeks prior to her death. Ms. Williams was last seen on Thursday, November 14, 1996 at around 8:30 P.M., and the State presented evidence that she had been wearing the same clothing as when her body was found on November 27. There was also testimony that both Amber Williams and the defendant occasionally went on "country cruises" in the rural areas around St. Marys to consume alcohol and smoke marijuana. The State presented evidence indicating that the defendant was familiar with the area where Ms. Williams' body was discovered, and had in fact visited that general area with several other young women prior to Ms. Williams' death. Evidence also indicated that the defendant had owned knives, and that the defendant and his friends often gathered in his garage and carved into a workbench that was located there. Finally, the State presented evidence that someone had carved the words "I killed" on the closet door of an apartment where the defendant had briefly lived, and that the words were carved during the period that the defendant had lived in the apartment.
In regard to the forensic evidence, the State presented the testimony of Dr. Cynthia Beisser, who conducted the autopsy on Ms. Williams. Dr. Beisser confirmed that Ms. Williams had died of "sharp force injury" and ratified the theory that the injuries had been caused by a knife. Id. at *744-60. Dr. Beisser also noted that Ms. Williams' underwear contained a sanitary napkin, and the police retrieved a used sanitary napkin from Ms. Williams' bedroom. The State also presented testimony from Jeff Williams, a forensic scientist with the Ohio Bureau of Criminal Investigation. Mr. Williams examined a semen sample taken from Amber Williams' body and noted that "there was a very large concentration of sperm [in the semen] and that all of the [sperm] heads [had] tails." Transcript, at *787. Mr. Williams indicated that both findings were significant:
 If there is a larger quantity of sperm and the sperm has tails that would be indicative of recent sexual intercourse relative to, in a living victim when the swabs are collected by hospital personnel, or relative to time of death for a deceased person.
 Basically, the most important factor in addition to the concentration is the presence or absence of tails, and the reason for that is the literature, the forensic literature, is clear that tails you do not see spermatozoa with tails greater than twenty four (24) hours [after intercourse]. And that's just some tails and in this particular case virtually all of those heads had tails on them so that would be strong indication of very recent sexual intercourse.
 Id. at *789 (emphasis added). In addition to noting the presence of tails on the spermatozoa, Mr. Williams also testified that the quantity of sperm was significant: "[I]f you have a living person you're going to have an ambulatory, walking individual who has been engaged in normal body functions, whether those be douching, urination, defecation, and then, of course, the ambulatory the gravity [sic] acting to pull the seminal components out of the vaginal vault." Id. at *791. Mr. Williams confirmed that menstruation could cause additional drainage of semen and dilution of the quantity of sperm in the vaginal vault. He also testified that if a body were frozen, "[t]he sperm or physical evidence would be preserved as long as the body is." Based upon all of these observations, and specifically based on the large quantity of sperm in the sample and the fact that virtually all of those sperm retained their tails, Mr. Williams concluded that Amber Williams had "engaged in sexual intercourse at or near the time of her death * * *." Id. at *792.
Finally, the State presented testimony from Meghan Clement, a DNA analyst with Lab Corp. of America. Ms. Clement participated in the DNA testing of the samples from Ms. Williams, the defendant, and fifteen other potential suspects in the case. Ms. Clement testified that of the several potential suspects, the defendant was the only positive DNA match for donor of the semen sample retrieved from Ms. Williams' body, and indicated that there was a very slim likelihood that another man had been the donor of the semen:
 The probability of randomly selecting an unrelated individual with the profile obtained from the sperm fraction of the vaginal swab is approximately one in two billion, six hundred and forty million for the African-American population, one in approximately eleven million, five hundred thousand for the Caucasian population, one in twenty-three million, eight hundred thousand for the Southeastern Hispanic population and one in approximately eleven million, eight hundred thousand for the Southwestern Hispanic population.
 Id. at *851. After the close of the State's case, the defendant moved for a judgment of acquittal on all counts pursuant to Crim.R. 29(A). The three-judge panel unanimously denied the motion, and the defense chose to rest rather than present a case. The panel subsequently acquitted the defendant of both counts of Kidnapping and of Aggravated Murder, but convicted the defendant of Murder, Corruption of a Minor, and Possession of Criminal Tools. The panel found the defendant to be a sexual predator, and sentenced him to eighteen months for Corruption of a Minor, fifteen years to life for Murder, and twelve months for Possession of Criminal Tools, all sentences to be served consecutively. The appellant now asserts four assignments of error with the panel's judgment.
 The trial court erred in denying Mr. Brock's motion for acquittal because there was insufficient evidence to prove that he was guilty of murder and possession of criminal tools. Mr. Brock's conviction for these offenses violates due process.
 Mr. Brock's conviction is against the manifest weight of the evidence and therefore violates due process.
 As defendant's first and second assignments of error raise similar issues for our review, we will address them together. Defendant argues that his convictions for murder and possession of criminal tools are based upon insufficient evidence and are against the manifest weight of the evidence.
An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph 2 of the syllabus. R.C. 2903.02(A) provides: "No person shall purposely cause the death of another * * *." Defendant argues that while the evidence presented at his trial establishes that he had sex with Amber Williams, it is insufficient to establish that he purposely caused her death. We disagree. The unrefuted testimony of BCCI forensic scientist Jeff Williams strongly supports the conclusion that the person who had sex with Amber Williams is the same person who killed her, because the sexual intercourse occurred "at or near her time of death." Transcript, at *792 (emphasis added). Similarly, the testimony of Dr. Cynthia Beisser regarding the wounds found on Ms. Williams' body strongly supports the conclusion that the "sharp force injury" that killed her was inflicted with purpose. Id. at *744. Finally, the DNA evidence presented by Meghan Clement establishes that the defendant was the person who had sexual intercourse with Ms. Williams "at or near the time of death." See id. at *851 and id. at *792. This evidence, when viewed in a light most favorable to the prosecution, provides a firm basis upon which rational trier of fact could have found the essential elements of the murder proven beyond a reasonable doubt. Cf. Jenks, 61 Ohio St.3d at paragraph 2 of the syllabus.
R.C. 2923.24(A) provides that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." The defendant contends that the State presented insufficient evidence to convict on this charge. Again, we disagree. Dr. Beisser testified that the cause of Amber Williams' death was "sharp force injury," and she indicated several times in her direct and cross-examination testimony that the fatal injury was consistent with a knife wound. See Transcript at *744 et seq.; id. at **757 et seq. Moreover, she also testified that it was "unlikely" that the fatal wound could have been inflicted unless Ms. Williams had been restrained. Finally, she specifically testified that the small nonfatal wound on Ms. Williams' neck was consistent with a knife wound. Accordingly, Dr. Beisser's testimony provides evidence of both the use of a knife in the commission of the murder and a criminal purpose in the use of that knife. Her testimony therefore provides a firm basis upon which rational trier of fact could have found the essential elements of possession of criminal tools proven beyond a reasonable doubt.
Defendant also contends that his convictions for murder and possession of criminal tools are against the manifest weight of the evidence. When reviewing this claim, Ohio appellate courts conduct an independent review of all the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 State v. Martin (1983), 20 Ohio App.3d 172, 175; see also State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A court of appeals reversing the judgment of a trial court on the basis of weight of the evidence acts as an additional juror who rejects the factfinder's resolution of the conflicting testimony. See id. at 387, citing Tibbs v. Florida (1982), 457 U.S. 31, 42. Furthermore, appellate courts reverse on the ground of manifest weight only in exceptional cases "where the evidence weighs heavily against the conviction." Thompkins, 78 Ohio St.3d at 389.
While it is true that the evidence of defendant's guilt is largely circumstantial, it is compelling. When taken as a whole, the evidence presented at trial provides a firm basis for the panel's verdicts of guilt, and we cannot say that those verdicts were a "manifest miscarriage of justice" or that "the evidence weighs heavily against the conviction." For these reasons, defendant's first and second assignments of error are overruled.
 The trial court erred in allowing evidence about Mr. Brock's prior sexual activity in the rural areas surrounding St. Marys because it was more prejudicial than probative. The admission of this evidence served to deny Mr. Brock due process and a fair trial.
 The trial court erred in allowing evidence about Mr. Brock's prior incarceration because it was more prejudicial than probative, thereby denying him due process and a fair trial.
 As defendant's remaining assignments of error address evidentiary questions, we will address them together. Initially, we must note that defendant was tried to a three-judge panel. "[T]he usual presumption [is] that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." State v. White (1968), 15 Ohio St.2d 146, 151, quoted in State v. Filiaggi (1999), 86 Ohio St.3d 230, 237-38
(reviewing evidentiary rulings of three-judge panel in capital case). Moreover, trial courts have broad discretion regarding the admission of evidence, and unless the trial court has clearly abused its discretion and that abuse has caused material prejudice to the defendant, an appellate court will not reverse a trial court's evidentiary rulings. See, e.g., State v. Joseph (1995), 73 Ohio St.3d 450, 460. Thus, in addition to affirmatively demonstrating that the panel utilized inadmissible evidence in an improper fashion, the defendant also has the burden of establishing that the trial court's evidentiary rulings were an abuse of discretion that caused him material prejudice.
In his third assignment of error, the defendant challenges several "other acts" witnesses presented by the State. The trial court summarized this evidence as follows:
 Ms. Farksadi, in 1994, was 17 or 18, when defendant took her out into the countryside north of St. Marys on Old 66, north of the second pond, when [sic] he tried to unzip her pants.
 Ms. [Askins] in July of 1994, at age 19, was picked up by the defendant [in] "uptown St. Marys" and went "cruising" north of St. Marys. Out in the country, she does not know [the] exact location, defendant made advances towards her which she rebuffed. Defendant stopped, then attacked her with some sort of cord or rope and strangled her to the point that she passed out. She remembers it being near Lock 14. She reported the incident to the police, but there was no prosecution. Defendant later apologized.
 Ms. Brown on August 12, 1994, when she was between the 7th and 8th grade, was picked up by defendant in "uptown St. Marys" and driven by defendant to a rest area off Deepcut Road on 66A where they first had sexual intercourse. As she was 13 or 14 years old, defendant was later convicted of Corruption of a Minor. They had more sexual activity after this "first time", but the first time was in this rural area north of St. Marys.
* * * *
 Ms. Houts, when she was 19, was with defendant in August, 1994, and taken by him out into the countryside north of St. Marys, north of U.S. 33 on Townline Kossuth road [and] north of a campground some distance [sic]. She is unsure of [the] exact location. Defendant tried to get her to perform fellatio [upon him]. She refused and left the car. He later drove off and she walked home several miles [away].
 Ms. Howe, in November, 1996, was picked up by the defendant and taken north of St. Marys, out into the rural area on country roads, by a curve [sic]. She saw Lock 14 on the way back. She got him to take her back into town to stop at LaGrande's to use the restroom, and she went out the back door.
 Ms. Resawher, when she was 15 or 16, was picked up in St. Marys by defendant who wanted to talk to her about her recent breakup with her boyfriend, [and] to help her get back together with him. Defendant took her out into the countryside north of St. Marys to an isolated road that had been closed. They got out of his car there. Defendant made some advances and said he loved her. She lied to him to get him to take her back to town.
 Ms. Hubble, in September of 1996 or 1997, was taken [by defendant] with [defendant's friend] Raymond Bey and [defendant's sister] Cindy Brock, to an isolated spot. Defendant drove to a place different than where they had earlier agreed to go camping. The place was on a dead-end road north of St. Marys. Defendant tried to kiss [Ms. Hubble, and] she rebuffed [him]. The two couples stayed till [sic] dawn, then went to Cindy's house, where [Ms. Hubble] saw defendant playing with a knife.* * * *
 The trial court held that the foregoing evidence "does `tend to show' knowledge of the geographical area, [and] a pattern of taking girls to such areas for purposes of sexual advances. Coupled with the semen in the victim's vagina, the probative value of such evidence exceeds any prejudicial effect." By contrast, the defendant contends that the evidence is only minimally probative of his knowledge of the surrounding areas, and was in fact highly prejudicial in that it was evidence of his bad character and led to the impermissible inference that he had acted in conformity with that character. Cf. Evid.R. 404(B).
We acknowledge that "prior bad acts" evidence is often inadmissible and troubling to courts for the very reasons that the defendant indicates. In this case, however, that the record demonstrates that the trial court was careful to avoid the impermissible inference:
 The facts [at] issue cannot and must not be used to try to prove the character of the defendant, to show that the defendant acted in conformity therewith. Accordingly, the state cannot use such testimony to imply or infer that because the defendant did bad things toward these other females, he is guilty of this offense. * * * * [However] the evidence is admissible to prove * * * identity, knowledge, plan, scheme, motive, opportunity (through knowledge of the area and his experience in finding girls in these blocks and taking girls to this area) through the characteristics of his acts rather than through the defendant's character.
 Cf. id. We agree with the trial court's analysis. Prior acts are admissible for the limited purposes described in Evid.R. 404(B), and the trial court's rulings made it clear that this evidence was considered for these purposes only. Cf. State v.
Pearson (1996), 114 Ohio App.3d 168, 185-87
(describing permissible uses of "other acts" evidence). The evidence was admitted to establish the defendant as the person who took Amber Williams to the wooded area off Koenig Road and his motive in doing so. Coupled with the evidence of defendant's semen found in Ms. Williams' vagina, the evidence is highly probative to the resolution of those disputed issues. While there may be other purposes both permissible and impermissible for which such evidence may be offered, we cannot say that in this case the evidence was used for an impermissible purpose or that the trial court's decision to allow it was an abuse of discretion.
In his fourth assignment of error, defendant contends that the trial court erred by admitting the administrative records of his prison sentence during his prior incarceration for Corruption of a Minor. The trial court again admitted this evidence for the limited purposes described in Evid.R. 404(B). Specifically, the State sought to prove that the defendant had murdered Ms. Williams to avoid going back to prison for corruption of a minor and was therefore guilty of a specification attached to the Aggravated Murder charge. The State utilized the records to establish the defendant's acute hatred of incarceration and to show that his knowledge that sexual intercourse with an underage female could lead to further incarceration. The trial court admitted the documents for the limited purpose of establishing "motive, intent, and knowledge." Transcript, at * 486. The defendant contends that despite the fact that his case "was tried to a three-judge panel rather than a jury, the prejudicial effect was obvious." Brief of Appellant at *9.
We disagree. Defendant argues that he was "convicted of killing Ms. Williams despite a complete lack of evidence that he murdered her." Id.
Contrary to defendant's contention, this Court has already concluded that defendant's conviction is supported by sufficient evidence and was not against the manifest weight of the evidence without considering the contents of his prison records. See supra at * 7-10. Moreover, the defendant has wholly failed to demonstrate that the trial court utilized the records beyond the limited purposes for which they were admitted, and has similarly failed to demonstrate how the trial court abused its discretion by admitting the records for those limited purposes. Cf.State v. White, 15 Ohio St.2d at 151. For these reasons, we believe that even if the trial court's decision to admit defendant's prison records was erroneous, such error was harmless. State v. Henderson (1991),76 Ohio App.3d 290, 296 (allegedly erroneous admission of alleged prior sexual misconduct was constitutionally harmless in light of jury instruction to consider evidence for limited purpose). Accordingly, defendant's third and fourth assigned errors are overruled. The judgment of the Auglaize County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
 WALTERS, P.J., and BRYANT, J., concur.