[Cite as *State v. Beck*, 2016-Ohio-8122.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-150539 |
| | | TRIAL NO. B-1304320A |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| PETER BECK, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  December 14, 2016


*Michael DeWine*, Ohio Attorney General, *Katherine Mullin*, *Jocelyn K. Lowe* and *Daniel Kasaris*, Assistant Attorneys General, for Plaintiff-Appellee,

*Squire Patton Boggs (US) LLP*, *Pierre Bergeron*, *Lauren Kuley* and *Jeffrey DeBeer*, for Defendant-Appellant.

Per Curiam.

{¶1}    Peter Beck was indicted on over 30 charges related to his involvement in influencing investors to make capital contributions to a start-up technology firm, Christopher Technologies ("CTech").  Following a ten-week bench trial, Beck was found guilty of three counts of theft, three counts of securities violations, and seven counts of perjury.  He was acquitted of the remaining charges.  The trial court imposed an aggregate prison sentence of four years.  Beck now appeals, arguing, among other things, that his convictions for the securities violations and theft should be reversed because they were based on actions that occurred outside the applicable statute of limitations, and that his perjury convictions should be overturned because the record does not demonstrate that his testimony was false.  Finding merit to some of Beck's arguments, we reverse the convictions for the securities violations as well as all seven perjury convictions.  In all other respects, we affirm the trial court's judgment.

{¶2}    In 2006, John Fussner and Mark Woods formed CTech to develop and sell a safety product called "Account4Me."  Fussner then reached out to Beck, a certified public accountant, to discuss how CTech could begin raising money to support its operations.  Beck referred Fussner to Tom Lysaght, the owner of TML Consulting, LLC, ("TML").  CTech eventually contracted with TML to raise capital for CTech. Beck's accounting firm worked for CTech preparing financial statements and advising its bookkeeper.  In the summer of 2007, Fussner asked Beck to become the chief financial officer ("CFO") for CTech.  Beck obtained business cards with the CFO title and held himself out to potential investors as the CFO of CTech.

**Wells Fargo Investors**

{¶3}   CTech secured capital through TML's efforts.   But more money was necessary by the end of 2007 to keep the company afloat.  In early December 2007, Beck and Fussner met with P.J. Boland, Corey Jordan and Robert Sprangley, three financial advisors who worked at Wells Fargo, in an effort to persuade them to personally invest in CTech.  At this meeting, Beck held himself out as the CFO of CTech and discussed the financial condition of the firm.  All three advisors testified that Beck told them that he was not receiving any compensation from CTech except for "sweat equity," the firm had little or no outstanding debt, CTech was at the end of private offering and was only selling three more shares in the firm, the projected loss for 2007 was between $600,000 and $650,000, the monthly "burn rate" was between $40,000 and $50,000, and the three financial advisors' investment would be used toward product development.   The three advisors were also told at this meeting that CTech was in the process of finalizing a deal with a major corporation that would bring significant revenue.  The three advisors all testified that based on this information, they thought that CTech would be profitable by the latter part of 2008.

{¶4}   Each investment advisor also testified that as a result of his conversation with Beck he decided to invest in CTech.  The three advisors pooled their money, each personally contributing $50,000, to invest in one share of CTech. Each advisor wired his money to CTech on or around December 21, 2007.  Sprangley testified that the wiring instructions were provided to them by Beck.

{¶5}   The three advisors attended their first CTech board meeting in April 2008, where they received a copy of CTech's financial statement dated December 31,

2007. After reviewing that statement, the three advisors realized that they had received inaccurate information about the finances of CTech. The advisors learned that Beck was receiving compensation from CTech; that despite being told that CTech had no outstanding debt, the financial statement showed that CTech had over $800,000 in loans from 2006 and 2007; that the burn rate was actually $150,000 per month instead of $50,000 per month; that CTech was operating at a loss of 1.5 million dollars, which was $900,000 more than the three advisors had been led to believe; that the three advisors' investment was not used toward product development, but instead was used to pay salaries; and that CTech was selling three more shares, even though the investors had already purchased one of the allegedly last three shares in the firm.

**The Walters' Investment**

{¶6} In July 2008, Beck met with Tom and Tina Walter at the request of Tom Lysaght, who owned TML. Tom Walter testified that this meeting occurred on either July 8 or July 10, 2008. Walter testified that at that meeting Beck had given him a business card, which indicated that Beck was the CFO of CTech and that he was a certified public accountant. Although CTech was struggling financially at this point, Walter testified that when he had asked Beck about the financial solvency of CTech, Beck's responses had indicated that CTech was a solvent company—it had ongoing bills but no significant debt. Walter also testified that during this meeting he was led to believe that CTech's product would be on the market soon and that CTech already had a buyer that would result in significant revenue. Because of this information, the Walters invested $150,000 in CTech. Walter wired $50,000 to CTech on July 16, 2008, and the remaining $100,000 investment on July 20, 2008.

{¶7} In 2010, Walter had a telephone conversation with Lysaght that caused Walter to suspect that his investment in CTech was part of a "ponzi scheme." Lysaght died shortly thereafter, so Walter began seeking TML's business records. Unable to obtain the business records from Lysaght's widow, Walter contacted Beck, who obtained the records from Lysaght's home and brought them to Walter. Walter reviewed the records and realized that he had been defrauded. Walter notified the Ohio Division of Securities, which began an investigation. As part of that investigation, Beck gave testimony under oath in a "Rule 23" hearing about his work at CTech and his involvement with investors.

{¶8} On July 19, 2013, Beck was indicted for multiple counts of theft and securities fraud. The theft offenses pertaining to the investments made by the three financial advisors alleged that the thefts had occurred in July 2008 and August 2008. The securities-violation offenses related to Tom and Tina Walter alleged that they had occurred on July 22, 2008.

{¶9} A second indictment was issued on February 13, 2014, charging Beck with engaging in a pattern of corrupt activity, aggravated theft, theft, perjury, fraud, receiving stolen property, securities violations, and money laundering. The theft offenses pertaining to the three financial advisors alleged that the thefts had occurred December 21, 2007, through August 13, 2008.

{¶10} The parties agreed to consolidate the indictments and dismiss the duplicative counts. There were later amendments to the indictment that are not pertinent to this appeal. Eventually, the trial court found Beck guilty of 13 counts and sentenced him to a four-year prison term. Beck now appeals.

{¶11} In his first assignment of error, Beck maintains that his theft-by-deception convictions and his securities-violation convictions should be reversed because they were based on conduct that occurred outside the statute of limitations. Because Beck did not raise this issue below we review for plain error. *See* Crim.R. 52(B). Notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error does not exist unless it can be said that, but for the error, the outcome of the proceeding clearly would have been otherwise. *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990).

### Theft

{¶12} Beck contends that his three convictions for theft related to the investments made by the three financial advisors are barred by the statute of limitations. We are unpersauded.

{¶13} The statute of limitations for theft by deception is six years. R.C. 2901.13(A)(1)(a). However, "[t]he period of limitation shall not run during any time when the corpus delecti remains undiscovered." R.C. 2901.13(G). The corpus delecti is "the body or substance of the crime and is made up of two elements: (1) the act itself and (2) the criminal agency of the act." *State v. Climaco*, 85 Ohio St.3d 582, 586, 709 N.E.2d 1192 (1999), citing *State v. Hensley*, 59 Ohio St.3d 136, 138, 571 N.E.2d 711 (1991). In cases other than those involving child abuse, discovery of the corpus delicti occurs "when any competent person other than the wrongdoer or someone * * * [equally at fault] with him has knowledge of both the act and its criminal nature * * *." *Hensley* at 137.

6

{¶14} Beck's convictions for theft by deception were based on conduct that occurred in December 2007. While the record does demonstrate that the criminal act (misrepresenting the financial condition of CTech to a group of investors) did occur in December 2007, the criminal agency of the act was not discovered until, at the earliest, April 2008. The three financial advisors all testified that they first saw CTech's 2007 year-end financial statements at the April 2008 board meeting. At that meeting, the financial statements showed, among other things, that the burn rate was much higher than Beck had represented in their December 2007 meeting and that there was also significant debt that was not disclosed to them. All three advisors testified that this was the first time that they had become aware that Beck had given them inaccurate information about the financial condition of CTech at the December 2007 meeting.

{¶15} Because the corpus delecti of the crime remained undiscovered until April 2008, the statute-of-limitations period did not begin to run until that time. Thus, the state had until April 2014 to bring theft charges against Beck. Although the parties dispute which indictment first charged Beck with theft based on the conduct that occurred in December 2007, we do not need to decide that question because even using the indictment filed on the later date—February 13, 2014—the theft charges were still brought within the appropriate limitations period. Accordingly, the trial court did not commit plain error by convicting Beck of three counts of theft by deception.

**Securities Violations**

{¶16} Beck argues that his three convictions for securities fraud under three different sections of R.C. 1707.44 should be vacated because they were based on

actions occurring outside the statute of limitations. R.C. 1707.28 provides that "[all] prosecutions and actions by the division of securities or the director of commerce for a violation of any provision of sections 1707.01 to 1707.45 of the Revised Code must be commenced within five years after the commission of the alleged violation."

{¶17} The state contends that the five-year statute-of-limitations period only applies to "prosecutions and actions" by "the division of securities or the director of commerce" and not to prosecutions by the state. In support, the state relies on the fact that former R.C. 1707.28, which required "all prosecutions under sections 1707.01 to 1707.45" to be commenced in three years, was amended in 2003, and now only requires "prosecutions and actions" by the division of securities or the director of commerce to be brought within five years. The state argues that prosecutions by the state are subject to the six-year statute-of-limitations period applicable to theft offenses. (Beck was convicted under sections of R.C. Chapter 1707 that relied on conduct that could also be used to support the offense of theft.) We disagree.

{¶18} A clear reading of the statute and a review of the legislative history demonstrates that the five-year limitations period applies to *prosecutions* and, in addition, it applies to *actions* by the division of securities or the director of commerce. The legislative notes to 2003 Am.Sub.H.B. 7 specifically provide that "[t]he act increased the statute of limitations for prosecutions (continuing law) and *actions by the Division of Securities or the Director of Commerce* (added by the act) for a violation of the Securities Law from three years to five years (R.C. 1707.28)." Legis.Serv.Comm., Bill Analysis of Sub.H.B. 7, 10, 125 General Assembly.

{¶19} In the indictment issued on July 19, 2013, Beck was charged with (1) "knowingly mak[ing] * * * any false representation concerning a material and

relevant fact * * * for the purposes [of] selling any securities in this state" (R.C. 1707.44(B)(4)); (2) knowingly engaging in a fraudulent act while selling securities (R.C. 1707.44(G)); and (3) knowingly making a false statement, with the purpose to deceive, about the "value of securities * * * [or] the financial condition of any issuer of securities" (R.C. 1707.44(J)). The state alleged that all of these representations were made to the Walters on or about July 22, 2008. But at trial, the evidence demonstrated that the representations were actually made sometime around July 10, 2008. And, as a result of those representations, the Walters made their first wire transfer to CTech on July 16, 2008.

{¶20} Regardless of whether we use the date Beck made his representation or the date that the Walters first wired money in reliance on Beck's representations, both of those acts occurred, albeit barely, more than five years before the state brought charges against Beck. We note that although Walter did not discover that Beck's representations had been false and misleading until two years after the representations had been made, the statute-of-limitations period set forth in R.C. 1707.28 does not include an exception tolling the running of the statute until the discovery of the corpus delicti. *State v. Detillio*, 90 Ohio App.3d 241, 629 N.E.2d 1 (9th Dist.1991). Because Beck cannot be convicted for acts that occurred outside the limitations period, his convictions for the three counts of securities violations must be vacated.

{¶21} The first assignment of error is sustained in part and overruled in part.

**Third-Party Subpoenas**

{¶22}  In Beck's second assignment of error, he maintains that the trial court abused its discretion by granting several of the investors' motions to quash Beck's subpoena duces tecum.  We disagree.

{¶23}  Under Crim.R. 17(C), a trial court may quash or modify a subpoena if compliance would be unreasonable or oppressive.  When deciding a motion to quash a subpoena, the trial court must conduct an evidentiary hearing.  At the hearing, the proponent of the subpoena bears the burden of demonstrating that the subpoena is not unreasonable or oppressive by showing that (1) the subpoenaed documents are evidentiary and relevant; (2) they are not otherwise reasonably procurable in advance of trial by due diligence; (3) the proponent cannot properly prepare for trial without production and inspection of the documents and the failure to obtain the documents may tend to unreasonably delay the trial; and (4) the subpoena is made in good faith and not intended as a general "fishing expedition."  *In re Subpoena Duces Tecum Served upon Attorney Potts*, 100 Ohio St.3d 97, 2003-Ohio-5234, 796 N.E.2d 915, paragraph one of the syllabus.  An appellate court generally applies an abuse-of-discretion standard in reviewing a trial court's decision concerning a motion to quash a subpoena.  *Cincinnati v. Neff*, 1st Dist. Hamilton Nos. C-130411, C-130511 and C-130512, 2014-Ohio-2026, ¶ 8, citing *State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 37 (8th Dist.).

{¶24}  Here, a review of the record shows that the subpoenas duces tecum served on third parties, including Walter, the three financial advisors and their employer, Wells Fargo, were unreasonable and oppressive.  A month before trial Beck subpoenaed all "emails, text messages, instant messages, and other

10

communications" between 15 separate parties related to 11 separate subjects. Beck could not state with specificity what he was looking for and there was no time-period restriction placed on his request. Further, these investors had already provided hundreds of pages of documents to the state, which Beck could have and should have procured through the discovery process between the parties. Given that, we cannot say that the trial court abused its discretion in granting the investors' motions to quash the subpoenas duces tecum.

{¶25} The second assignment of error is overruled.

## Hearsay

{¶26} Beck contends in his third assignment of error, that the trial court erred by "categorically deeming all emails that the State introduced into evidence as 'business records' and admitting unauthenticated hearsay writings." We are unpersauded.

{¶27} "The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).

{¶28} Beck argues that alleged business records of TML and CTech were improperly admitted into evidence as unauthenticated or as hearsay. Even assuming that these records were unauthenticated or hearsay, Beck has not shown with any specificity, or even generally, how these documents, many of which he did not object to at trial, have materially prejudiced him. Additionally, in a bench trial, it is presumed that the judge "considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary."

*State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). It does not appear to the contrary upon our review of the record, and thus, we cannot say that the trial court abused its discretion in admitting the purported business records from CTech and TML.

{¶29} Next, Beck argues that the exhibit containing an email string between Donovan Donohoo, a partner in Beck's former accounting firm, and Corey Jordan, one of the financial advisors who invested in CTech, discussing Beck's status as the CFO of CTech and that Beck had been receiving compensation from CTech while Beck had been working for Donohoo, was inadmissible hearsay because the state failed to prove it was a business record of the accounting firm. Even presuming that this email string was hearsay, Beck was not prejudiced by its admission because there was other admissible evidence—the testimony of Walter and the three financial advisors—to show that Beck had been holding himself out as the CFO of CTech, and Beck admitted that he had received compensation from CTech in 2008.

{¶30} Because Beck has not demonstrated that he was materially prejudiced by the admission of the complained of records, we overrule the third assignment of error.

**Perjury**

{¶31} In his fourth assignment of error, Beck challenges his perjury convictions on the grounds that the state did not demonstrate that his answers were false, and/or his answers were in response to ambiguous questions.

{¶32} R.C. 2921.11(A) provides that "no person, in any official proceeding, shall knowingly make a false statement under oath * * * when [the] statement is material." No person may be convicted of perjury where proof of the falsity of a

statement is based solely on one other person's testimony. R.C. 2921.11(E). Further, falsity cannot be proved where a defendant gives a "literally true but nonresponsive" answer to the question asked even when the answer is "arguably misleading." *United States v. Bronston*, 409 U.S. 352, 362, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). Finally, it is the questioner's burden "to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360.

{¶33} In count 10 of the indictment, the state charged Beck with making a "false statement about receiving compensation or remuneration as the CFO of CTECH." During the Rule 23 hearing, Beck denied being compensated for his work as CFO of CTech, but he did admit that he had been compensated in 2008 for consulting services he and his accounting firm had performed for CTech. After reviewing Beck's testimony, we find that while some of Beck's testimony may be described as equivocal, we cannot conclude that it is clearly false. Therefore, his conviction for perjury under count 10 must be vacated.

{¶34} In count 11, the state charged Beck with making a "statement about not knowing that Tom Walter was an investor when Peter Beck knew Tom Walter was an investor." This charge is based on the following exchange during the Rule 23 hearing:

> Q. Okay. During your meeting with Mr. Walter, did you discuss the financial condition of Christopher Technologies?
>
> A. That was never brought up.
>
> Q. Did you bring it up?

A.    No, because I didn't know who this person was and what they were doing.

Q.    But you discussed the company, Christopher Tech, and you're CFO, but you didn't discuss the financial condition of the company –

A.    I answered –

Q.    -- to a potential investor?

A.    I answered – I didn't know he was a potential investor.

{¶35} The state contends that Beck knew that Tom Walter was an investor because Tom and Tina Walter both testified that when Beck arrived at the meeting he had handed them his business card and introduced himself as the CFO of CTech. But the state does not indicate *when* Beck knew Walter was a potential investor. It is possible that he did not know when he first arrived for the meeting. Tom Lysaght of TML had arranged the meeting with the Walters and had asked Beck to attend. There is no evidence that prior to the meeting with the Walters Beck had been informed that Walter was a potential investor. Because we cannot say that Beck's response was clearly false, his conviction under count 11 must be vacated.

{¶36} In count 12, the state charged Beck with making a "false statement concerning Tom Walter's investment in CTECH." Specifically, Beck denied discussing the "financial condition" of CTech with Walter. At the Rule 23 hearing, Beck stated that he had not discussed the "financial condition" of CTech with the Walters, but that he had told them about CTech's products and that the company did not have much capital, as no one was investing because of the stock market crash. Beck argues that the term "financial condition" is vague and ambiguous. We agree.

From Beck's testimony, it appears he thought discussing the financial condition meant discussing the "financial statements." Both Mr. and Mrs. Walter testified that they discussed the "status" of CTech, but neither of them asked to review CTech's financial statements. It was not up to Beck to flesh out what "financial condition" meant. It was the duty of the investigator to pin down Beck's testimony regarding the specific discussion that took place between Beck and the Walters. The answer to a vague and ambiguous question cannot be used to support a perjury conviction. Consequently, his conviction for perjury under count 12 must be vacated.

{¶37} The next three counts of perjury are related to Beck's role in the investment made by Scott Michael of Michael Farms. In count 13, the state charged Beck with falsely claiming that he did not know what Michael Farms was. Although the state presented the testimony of one person who said that Beck knew what Michael Farms was, there is no other evidence to demonstrate this. The state claims that there are emails to Beck discussing Michael Farms, but there is no evidence to demonstrate that Beck read those emails. Accordingly, we cannot say that Beck's statement that he did not know of Michael Farms was false. Beck's conviction for perjury under count 13 must be vacated.

{¶38} In count 14, Beck was charged with making a false statement about his involvement in creating a "talking points" document prior to the presentation to Michael Farms. At the Rule 23 hearing, the investigator showed Beck a memo of talking points for the Michael Farms presentation, but this memo had another person's handwriting on it. Beck denied ever seeing that memo. The state presented no evidence to prove that Beck's statement was false. He may have seen a clean memo of the talking points, but the state did not demonstrate that Beck had seen the

memo that had been written on by someone else. Because his answer could have been literally true, his conviction for perjury under count 14 must be vacated.

{¶39} In count 15, Beck is charged with making a false statement when he denied knowledge that Tom Lysaght was going to pitch CTech to Michael Farms. Beck did not lie. The evidence shows that Lysaght was pitching TML to Michael Farms, not CTech. Because his answer to the question asked was true, his conviction for perjury in count 15 must be vacated.

{¶40} Finally, in count 18, the state alleged that Mr. Beck perjured himself in the following exchange:

> AGENT WARD: So when these investors say they asked you flat out, the guy – what's the guy you've known for 15 years? Bob?
>
> THE WITNESS: P.J.
>
> AGENT WARD: P.J., a person you have known for 15 years when he tells us he asked you flat out what the financial condition of the company was and you said we're fine, is that inaccurate?
>
> THE WITNESS: That's inaccurate.

{¶41} We hold that this exchange cannot support a perjury conviction. There is no evidence in the record that Beck told the three financial advisors that the financial condition of the company was "fine." No one testified that Beck had used that word to describe CTech's financial condition. Instead, the three advisors testified that Beck had answered their specific questions about the company's finances. While it is apparent that the financial advisors could have gleamed from

Beck's responses that the financial condition of the company was "fine," that is not the word Beck used to describe CTech. The perjury conviction under count 18 must be vacated.

{¶42} The fourth assignment of error is sustained. All seven perjury convictions must be vacated.

{¶43} We overrule Beck's fifth assignment of error in which he maintains that he received ineffective assistance of counsel. We have reviewed the record and cannot say that his trial counsel's performance fell below an objective standard of reasonableness. *See State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶44} Upon a review of the record, we also overrule Beck's sixth and seventh assignments of error claiming, respectively, that the cumulative effect of the trial court's errors denied Beck a fair trial and that Beck's convictions were against the manifest weight of the evidence. We find no cumulative error affecting Beck's remaining convictions, nor do we find anything in the record that suggests that the trial court, in resolving conflicts in the evidence, lost its way and created a manifest miscarriage of justice by finding Beck guilty of the three theft offenses. *See State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶45} In Beck's eighth and final assignment of error, he asks us to recognize a free-standing claim to actual innocence and overturn's Beck's theft convictions. We decline to do so. Accordingly, we overrule the eighth assignment of error.

{¶46} In light of our resolution of the first and fourth assignments of error, we remand this matter to the trial court with instructions to vacate Beck's securities-violations convictions and perjury convictions. We affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**FISCHER, P.J., HENDON** and **MOCK, JJ.**

Please note:

The court has recorded its own entry on the date of the release of this opinion.