[Cite as *State v. Dowell*, 2018-Ohio-4044.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-5 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-320 |
| | : | |
| ANTHONY C. DOWELL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of October, 2018.

. . . . . . . . . . .

RYAN C. SPITZER, Atty. Reg. No. 0093515, Assistant Prosecuting Attorney, Miami County Prosecutor's Office, 201 West Main Street, Troy, Ohio 45373
  Attorney for Plaintiff-Appellee

JAMES A. ANZELMO, Atty. Reg. No. 0068229, 446 Howland Drive, Gahanna, Ohio 43230
  Attorney for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Anthony Dowell appeals from his convictions on two counts of sexual battery. Dowell contends that the convictions were not supported by the weight of the evidence and that the State did not present evidence sufficient to sustain the convictions. He further contends that counsel was ineffective. Dowell also claims that his convictions violated his fundamental liberty interests and were, thus, unconstitutional. Finally, he claims that the trial court erred in sentencing.

{¶ 2} We conclude that there was sufficient, credible evidence upon which a reasonable finder of fact could have relied in finding Dowell guilty of the charged offenses. We further find no merit to his claim that his constitutional rights were violated or that the trial court erred in sentencing. Finally, we cannot conclude that counsel's failure to object to evidence resulted in prejudice.

{¶ 3} Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 4} In January 2016, Chad Albers, the assistant principal for Piqua Junior High School, was given a handwritten note. After an investigation, Albers determined that J. was one of the two students involved in writing the note. Albers spoke with J. and then contacted Children's Services. On January 22, 2016, Piqua Police Officer Adam Coe was dispatched to J.'s residence to assist Children's Services regarding a possible sexual offense. Coe, along with an employee of Children's Services, interviewed J. Coe subsequently interviewed Dowell, who is J.'s father, at the police station. On June 7, 2016, Dowell was indicted on two counts of sexual battery. He waived his right to a jury

trial, and the matter proceeded to a bench trial on February 28, 2017.

{¶ 5} J. testified that at the time of the offenses, she was living with Dowell, as well as Dowell's wife and four other children. J. testified that in the summer of 2015, Dowell attempted to get her to engage in masturbation. She testified that the time frame stuck out in her mind because it occurred around the time she spent the night at a friend's house. J. testified that she had lived with Dowell for approximately two and one half years, and that summer was the only time he let her spend the night with a friend. With regard to the incident, J. testified that Dowell called her into his bedroom, told her to pull down her pants and underwear, and had her sit on the bed with her legs across his lap. She testified that Dowell asked her if she knew how to do it. J. testified that Dowell told her to "move [her] fingers around and see if [she] could feel a bump." Tr. p. 76. J. testified that when she told him no, he stated that he was going to show her how and that he put his fingers inside her vagina. She testified that she told him to stop "maybe once or twice" but that she stopped making this demand because he was "getting mad at [her] for telling him to stop." Tr. p. 77.

{¶ 6} J. also testified that she got up on a school morning to get ready for school and was told that she had to stay home because she needed to be treated for lice. She testified that, although she was not the only child in the house who had long hair, she was the only one who had to stay home. She testified that lice treatment was applied to her hair and that she sat in the dining room with Dowell. In describing the incident, J. testified as follows:

A: After sitting there for a little bit, a while, [Dowell] asked me to pull down
my pants. And I asked why. He said because he wanted – he was looking

for something; I don't remember what it was called, but it was to see if I had had sex or not.

* * *

Q:   And when you say you don't remember what it's called, what do you mean by that?

A:   Like it – I don't remember what it's called, but it's something to see if I had had sex or not, apparently, I'm not sure what it was called.

Q:   When he used the word on this date, did you know what he was talking about?

A:   No.

* * *

Q:   All right, and what did he do next?

A:   He told me to open up my legs.

* * *

A:   He said to spread them, so I spread my legs.

Q:   Okay.   What did he say to you after you did that?

A:   He had asked me to hold open my vagina, so he could look inside to see if it was there.

Q:   What word did he use to describe your vagina?

A:   "Pussy."

Q:   Okay.   And was he satisfied with how you were holding your vagina apart?

A:   No.

\* \* \*

A:   According – apparently I was not holding it right, so he tried it himself.

Q:   All right, and what did he do, when you say "try it" what do you mean?

A:   He told me to move my fingers and he put his hand, and he tried to open my vagina or so and, yeah.

Q:   And where did he have his hands during this – at this time in relation to your vagina?

A:   Inside my vagina.

\* \* \*

Q:   And how do you know his fingers were in fact inside your vagina?

A:   I could feel it.

Q:   What did your dad tell you after he – or what did your dad have in his hand when he was doing this?

A:   In – he only had one hand there and in his other hand he had his phone.

Q:   What was he doing with his phone?

A:   He had the flashlight on it, and he was looking around.

Q:   Looking around where?

A:   Inside my vagina.

Q:   And what did your dad tell you the conclusions were or the result of him checking to see if you were still a virgin?

A:   That the thing was still there and I hadn't had sex.

\* \* \*

Q:   What happened when your dad was, as he termed it "checking," when

he was done checking?   What happened after that?

A:   I pulled up my pants and he turned back to the table and continued to play on his phone.

Tr. p. 69-71.

{¶ 7} J. further testified that Dowell then began a conversation with her about whether she had been masturbating.   She testified that when she answered negatively, Dowell asked her why she was not.   She testified that he then told her to try to find the "bump" and move her finger around to see if it felt good.   J. testified that she told him it did not feel good, and he stated that it should.   She testified that he then got a call and she left the room.

{¶ 8} Dowell's mother, "Grandmother," also testified at trial.   She testified that Dowell and his children came to her home for a cookout on July 4, 2015.   Grandmother testified that one of the children mentioned some words that made her wonder where they had learned the words.   She testified that Dowell then called her "an old fogey and [stated that she was] behind the times."   Tr. p. 113.   Grandmother testified that Dowell told her that the word masturbation had come up because he had taught the children how to masturbate because he did not want them to have sex and get a sexually transmitted disease.

{¶ 9} Grandmother testified that, in 2016, Dowell called her and stated that he had been at the police station with J.   Grandmother further testified as follows:

Q:   And why'd he tell you he was at the police station?

A:   He said that [J.] told about some things that happened, and he got upset with her because she was having sex.   That's what the kids had told him

was she was having sex.   And so he took her – was going to take her to the doctor and have the doctor check to see if she was still a virgin * * * He said the doctor wouldn't do it because she said she was not having sex, so the doctor seen – saw no need to go any further with it.

Q:   And how did he respond to that doctor visit?

A:   I think he was angry because he said he took her home and he was going to check himself to see if she was still a virgin.

Q:   And what did he tell you about checking [J.]?

A:   He told me that he made her take her clothes off, made her hold herself as far open as she could and – and he – he couldn't see; he used a flashlight on his cell phone, but couldn't see anything, so he used his fingers to spread her open further so he could see up inside to see if she was still a virgin.

Q:   And did he tell you anything about where his fingers were in relation to [J.'s] vagina at that time?

A:   They were inside, just at the edge but inside.

Tr. p. 115-116.

{¶ 10} Coe also testified at trial.   During his testimony, the videotape of Coe's interview with Dowell was introduced.   During the interview, Dowell stated that he had been informed that J. had engaged in sexual relations.   Dowell stated that he took J. to a gynecologist to check whether she had engaged in sex, but that the gynecologist refused to check.   Dowell stated that he was not worried about pregnancy, but that he was concerned about sexually-transmitted diseases.

{¶ 11} Dowell stated that he subsequently decided to check J. himself using a

diagram he found online. According to Dowell, he had J. sit on a seat and spread her legs while he used his cellphone flashlight to determine whether her hymen was still intact. Dowell denied any similar actions in the past. However, when Coe asked Dowell about a "summer incident," Dowell indicated that in 2015 he had a conversation with J. regarding masturbation. He indicated that he wanted to make sure that she knew not to engage in masturbation in public. Dowell indicated that he showed her how to masturbate using a diagram he found online. Dowell stated that he told J. to feel around for a bump and to focus on that area. Dowell denied touching J. during either incident.

**{¶ 12}** The trial court found Dowell guilty of both counts of sexual battery and sentenced him to a prison term of four years on each count; the terms were to be served consecutively, for an aggregate sentence of eight years. The trial court also designated Dowell a Tier III sexual offender. Dowell filed a timely appeal.

## II. Ineffective Assistance of Counsel

**{¶ 13}** Dowell's first assignment of error states as follows:

DOWELL RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.

**{¶ 14}** Dowell contends that he was denied the effective assistance of counsel at trial. In support, he argues that counsel's failure to object to the introduction of the handwritten note that Albers traced to J. was error. He further contends that trial counsel was ineffective because he failed to object to the testimony of J.'s friend, A., who was the

co-author of the note.

{¶ 15} The note, which was admitted into evidence as State's Exhibit 2, is a small, yellow piece of paper with some writing in ink and some in pencil. According to the record, J.'s writing is in pencil and A.'s responses are in ink. The text of the note is as follows:

J.: I was told to tell someone else this but remember when S. tould [sic] you guys my dad touched me inapropretly [sic]?

A.: Yeah.

J.: He did that again the day I was absent. P. [sic] told me I needed to tell someone else that!

A.: [T]ell the principal/Mrs. Mcgarahn[.]

J.: Why?

A.: You need to.

J.: What will she do?

A.: Help you.

J.: Won't she tell my parents?

A.: She'll tell the government.

J.: And they say something to my parents!

A.: Not really. Not if you tell her don't.

J.: Do you know what the government will do?

A.: Investigate.

J.: I asked P. to tell my actual mom what he did to me. When should I tell her?

{¶ 16} This court reviews alleged instances of ineffective assistance of trial counsel under the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). These cases provide that trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689; *Bradley* at 142. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial court proceeding would have been different. *Bradley* at 142.

{¶ 17} We begin by noting that counsel did object to A.'s testimony regarding the content of the note. Indeed, counsel objected more than once to this testimony. Thus, the claim that counsel was ineffective with regard to A.'s testimony is without merit.

{¶ 18} We next turn to the claim that counsel was ineffective for failing to object to the admission of the note which Dowell claims was hearsay.

{¶ 19} Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). A statement can be a written assertion. Evid.R. 801(A). Statements made outside the courtroom, offered at trial to prove the truth of what they assert, are generally inadmissible as hearsay unless an exception applies. Evid.R. 801(C); Evid.R. 802; *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987).

{¶ 20} Assuming the note constituted inadmissible hearsay and that counsel should have objected thereto, we cannot conclude that Dowell has met the second prong

of the *Strickland* test. We cannot say that the admission of the note without objection was serious enough to create a reasonable probability that, but for the error, the result of the trial court proceeding would have been different. As discussed below, there was sufficient evidence in this record upon which the trial court could have reasonably convicted Dowell regardless of the admission of the note. Further, without any evidence to the contrary, we will not presume that the trial court considered any improper evidence in deciding to convict. "Indeed, a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." *State v. Eubank*, 60 Ohio St.2d 183, 187, 398 N.E.2d 567 (1979), citing *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968).

{¶ 21} There is nothing in this record to indicate that the trial court improperly considered the contents of the note. Indeed, during the sentencing hearing, the trial court specifically noted that it found the testimony of J. and Grandmother credible and reliable. The trial court provided a valid basis for its decision to convict, and we cannot say that it was unsupported by the evidence. Thus, we cannot conclude that Dowell has shown that the note had a prejudicial effect, as he has not demonstrated that but for the admission of the note, the outcome of the trial would have been different.

{¶ 22} The first assignment of error is overruled.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 23} The second and third assignments of error asserted by Dowell are as follows:

DOWELL'S CONVICTIONS ARE BASED ON INSUFFICIENT

EVIDENCE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 1 & 16, ARTICLE I OF THE OHIO CONSTITUTION.

DOWELL'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS IN THE UNITED STATES CONSTITUTION AND SECTIONS 1 & 16, ARTICLE I OF THE OHIO CONSTITUTION.

**{¶ 24}** Dowell contends that the State did not present evidence sufficient to sustain his convictions. He further contends that the convictions were not supported by the weight of the evidence.

**{¶ 25}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test enunciated in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991):

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 26} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. A court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 27} Further, "[a]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17. Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 28} Dowell was convicted of sexual battery in violation of R.C. 2907.03(A)(5),

which states that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." Sexual conduct as defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 29} Dowell first contends that the State did not present evidence sufficient to sustain the conviction. In support, he argues that the prohibition against sexual battery does not apply to touching performed while engaged in the parental care of a child and that the State thus failed to prove that he acted without privilege. In other words, he argues that, as J.'s natural parent, he had the privilege to act as he did because he was merely providing parental care.[1] Dowell cites *State v. Mundy*, 99 Ohio App. 3d 275, 650 N.E.2d 502 (2d Dist. 1994), for the proposition that touching one's child, when done in the course of providing parental care, cannot be deemed criminal.

{¶ 30} In *Mundy*, this court attempted to distinguish innocent touching performed in the course of raising a child from touching done for the purpose of sexual arousal or gratification as proscribed by R.C. 2907.05. *Id.* at 289. In doing so, we noted that touching with "the specific intent or purpose to achieve sexual arousal or gratification * * *

---

[1] We note that Dowell cites R.C. 2901.01(L) for the definition of privilege as it relates to sexual battery. R.C. 2901.01 does not contain a section (L). However, R.C. 2901.01(A)(12) defines privilege as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."

distinguishes criminal conduct from noncriminal, innocent behavior, such as accidental touching or a touching of the prohibited areas incidental to bathing, changing a diaper, or playful wrestling." *Id.* Nowhere in our opinion did we opine that every act of touching done by a parent constitutes noncriminal, innocent behavior.

{¶ 31} Even were we to assume that teaching a 14-year-old child to masturbate or that inspecting a child's hymen falls under the rubric of acceptable parental care, inserting one's fingers into the child's vagina to achieve these goals clearly exceeds the bounds of that care. We find no authority conferring a right or license to a parent to insert fingers into a child's vagina under the circumstances cited by Dowell, nor do we find authority granting a parent immunity from prosecution for such action. In short, we find no privilege that would permit Dowell's behavior.

{¶ 32} As noted, J. testified that Dowell inserted his fingers into her vagina on two separate occasions. This testimony was corroborated by Dowell's mother who testified that Dowell told her that he had placed his finger into J.'s vagina while trying to determine whether her hymen was intact. This evidence was sufficient to permit a reasonable finder of fact to conclude that the State presented evidence of each element of the offense of sexual battery.

{¶ 33} Next, Dowell contends that his convictions were not supported by the weight of the evidence because the testimony of his mother and of J. was not credible. He first claims that J. was angry with him because she did not get to visit with her mother once Dowell obtained custody, and that she, thus, fabricated the allegations against him. In support, he relies upon the testimony of J.'s half-sister, D., who testified that J. was mad at Dowell because J. had been removed from her mother's custody, and that J. stated

that she did not want to live with Dowell because she did not get to see her friends or her mother. D. also testified that J. "would retaliate by getting extremely angry, telling lies." Tr. p. 151.

**{¶ 34}** J. testified that she was initially uncomfortable when she began having visitation with Dowell because she had not met him until he initiated visitation during the year she was in the sixth grade. She testified that when Dowell obtained custody at the end of her sixth grade year, she did not have any visitation with her mother, and that she was upset by the lack of visitation. Defense counsel cross-examined J. regarding her feelings, but J. never stated that she held Dowell responsible for the lack of visitation. Indeed, her testimony indicated that her mother's behavior was the reason for the lack of visitation.

**{¶ 35}** Dowell also contends that his mother's testimony was not credible because she did not, during her two interviews with investigators, mention her claim that Dowell had told her he inserted his fingers into J.'s vagina. When asked about this, Grandmother indicated that she answered the questions the investigators asked her, and that they never asked her any questions about the issue of penetration. Grandmother further testified that she was not happy that she was called to testify against her son at trial. Grandmother's testimony was corroborated by one of the investigators who indicated that he interviewed Grandmother mainly with regard to determining whether there were any other victims and that he could not recall asking her about penetration. Additionally, Coe did not testify that he asked Grandmother about penetration.

**{¶ 36}** "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find

that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, \*4 (Aug. 22, 1997). "The trier of fact is better situated than an appellate court to view witnesses and to observe their demeanor, gestures, voice inflections and to use those observations in weighing credibility." *State v. Lewis*, 4th Dist. Scioto No. 01CA2787, 2002 WL 368625, \* 3 (Feb. 25, 2002). "A trier of fact is free to believe all, part or none of the testimony of each witness." *Id.*, citing *State v. Long*, 127 Ohio App.3d 328, 713 N.E.2d 1 (4th Dist.1998).

**{¶ 37}** Dowell's claims regarding the credibility of Grandmother and J. were explored during the defense's cross-examination of the witnesses. The trial court, thus, was aware of these issues but still credited their testimony. This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). Our review of the transcript and record does not convince us that the trial court, as the finder of fact, lost its way in deciding to credit the testimony of J. and Grandmother.

**{¶ 38}** We conclude that the record contained evidence sufficient to support the convictions and that the convictions were not against the weight of the evidence. Accordingly, the second and third assignments of error are overruled.

**IV. Liberty Interest to Parent a Child**

{¶ 39} Dowell asserts the following as his fourth assignment of error.

DOWELL'S CONVICTIONS ARE UNCONSTITUTIONAL PURSUANT TO HIS LIBERTY INTERESTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 40} Dowell contends that, because he "acted in his role of a parent being concerned about the health of his daughter upon learning that she may be sexually active," his conduct was "protected by his liberty interests under the Fourteenth Amendment to the United States Constitution."

{¶ 41} Dowell is correct that the ability to raise his child is a fundamental liberty interest as "[t]he rights to conceive and to raise one's children have been deemed 'essential' * * *." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). However, the Supreme Court of Ohio has noted that in some circumstances, this right is not inviolate. *See In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, wherein the Court stated:

In *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the United States Supreme Court described the interest of parents in the care, custody, and control of their children as one of the oldest of the fundamental liberty interests recognized in American law. We also recognize that there is an essential and basic civil right to conceive and raise children. * * * [But, d]espite the fact that we have found that parents who are suitable have a paramount right to raise and care for their children, it is equally well settled that "[t]he fundamental interest of parents is not

absolute. The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so.

*Id.* at ¶ 39 -40.

{¶ 42} Again, even if we were to accept Dowell's apparent claim that teaching a child to masturbate or checking to determine whether a child's hymen is intact are inherent parental liberty interests, we cannot find and Dowell does not cite, any authority for the proposition that a parent may insert his fingers into a child's vagina in furtherance of such goals. Accordingly, we conclude that Dowell's claim that he has a liberty interest in such activities lacks merit. Likewise, we conclude that his claim that his convictions were unconstitutional because they violated these claimed interests has no merit. Accordingly, the fourth assignment of error is overruled.

## V. Consecutive Sentences

{¶ 43} Dowell's fifth assignment of error states as follows:

THE TRIAL COURT UNLAWFULLY ORDERED DOWELL TO SERVE CONSECUTIVE SENTENCES, IN VIOLATION OF HIS RIGHTS TO DUE PROCESS, GUARANTEED BY SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶ 44} Dowell contends that the trial court erred by imposing consecutive sentences.

{¶ 45} If a defendant challenges a trial court's consecutive-sentence findings,

"R.C. 2953.08(G)(2)(a) directs the appellate court 'to review the record, including the findings underlying the sentence' and to modify or vacate the sentence 'if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * * of the Revised Code.' " *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 28, quoting R.C. 2953.08(G)(2)(a).

**{¶ 46}** "There are two ways that a defendant can challenge consecutive sentences on appeal. First, the defendant can argue that consecutive sentences are *contrary to law* because the court failed to make the necessary findings required by R.C. 2929.14(C)(4)." (Emphasis sic.) *State v. Adams*, 2d Dist. Clark No. 2014-CA-13, 2015-Ohio-1160, ¶ 17, citing R.C. 2953.08(G)(2)(b) and *Bonnell* at ¶ 29. "Second, the defendant can argue that the record does not support the findings made under R.C. 2929.14(C)(4)." *Id.*, citing R.C. 2953.08(G)(2)(a) and *State v. Moore*, 2014-Ohio-5135, 24 N.E.3d 1197 (8th Dist.).

**{¶ 47}** R.C. 2929.14(C)(4) is an exception to the presumption in favor of concurrent sentences in R.C. 2929.41(A). In this regard, R.C. 2929.14(C) provides that:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 48}** Dowell claims that the trial court failed to make the appropriate findings during the sentencing hearing. A review of the sentencing hearing transcript shows that the trial court made the following statements with regard to the consecutive sentences:

* * * Those sentences shall run consecutively. These sentences – the consecutive sentences are necessary in this particular case to protect the public and punish the Defendant. These consecutive sentences are not disproportionate. The harm in these cases – in this case is so great and unusual that a single term does not adequately reflect the seriousness of the conduct. These being two separate incidences of unlawful sexual conduct.

**{¶ 49}** "[A] word-for-word recitation of the language of the statute is not required,

and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. Although the precise statutory language was not used at the sentencing hearing, we can easily conclude that the trial court was referencing R.C. 2929.14(C)(4)(b) when it stated "[T]he harm * * * in this case is so great and unusual that a single term does not adequately reflect the seriousness of the conduct. These being two separate incidences of unlawful sexual conduct." We can additionally discern from this language that the trial court concluded that the two incidents of sexual battery constituted a course of conduct, and that the harm caused by the two acts of sexual battery was so great or unusual that a single prison term would not adequately reflect the seriousness of Dowell's conduct. This case, we note, is in contrast to cases such as *State v. Wills*, 2d Dist. Montgomery No. 25357, 2013-Ohio-4507, and *State v. Thomas*, 2d Dist. Montgomery Nos. 25331, 25332, 2014-Ohio-1120, in which, based upon the trial court's sentencing pronouncements, it could not be concluded that the trial court had engaged in the required consecutive sentence analysis. We further conclude that there was sufficient evidence in the record to support the findings regarding consecutive sentences.

**{¶ 50}** The fifth assignment of error is overruled.

## VI. Conclusion

**{¶ 51}** All of Dowell's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

WELBAUM, P.J., concurs.

DONOVAN, J. concurs in part and dissents in part:

{¶ 52} I concur with the majority's findings that Dowell was not denied the effective assistance of counsel, that his convictions were supported by the evidence and not against the manifest weight of the evidence, and that his convictions did not violate his liberty interest in parenting his child.

{¶ 53} I would reverse and remand on the issue of consecutive sentences. In *Wills* we noted the following language from *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 14-17 (8th Dist.):

> [N]ot requiring slavish adherence to the specific wording of the statute is not the same as relieving the court of the duty to make the required "findings." R.C. 2929.14(C)(4) requires the court to make specific "findings." In the past, we have found those findings can be implicit in context when the court's statements during sentencing are intended to encompass the relevant provisions of the sentencing statutes. But in doing so, we have arguably frustrated the purposes underlying the requirement for findings as a predicate for ordering consecutive sentences.
>
> The [S]upreme [C]ourt has recognized that "Ohio appears to be unique in having a rule that sentences of imprisonment shall be served concurrently." The imposition of consecutive sentences in Ohio is thus an exception to the rule that sentences should be served concurrently. And there is no doubt that the provisions of H.B. 86, like those of S.B.2 before it,

were intended, among other things, to alleviate overcrowding in the prison system.

By imposing a requirement that the trial judge make specific findings before ordering sentences to be served consecutively, the General Assembly toughened the standard for consecutive sentences. However, the revived consecutive sentencing statute codified in R.C. 2929.14(C)(4) does not place a heavy burden on the trial judge. Indeed, it is arguably easier to impose consecutive sentences today than it was under former R.C. 2929.14(E)(4) because the revived version did away with the requirement that the court justify its findings by giving reasons for making those findings.

Because the statute so clearly requires specific findings for the imposition of consecutive sentences, those findings must be entered at the time the court orders sentences to be served consecutively. What we mean by this is that regardless of what the trial judge might say during sentencing regarding the purposes and goals of criminal sentencing, compliance with R.C. 2929.14(C)(4) requires separate and distinct findings in addition to any findings related to purposes and goals of criminal sentencing. Too often, we have been called to examine words or phrases scattered throughout a sentencing transcript and piece them together to decide whether the court made the required findings. * * * If the word "findings" is to have any meaning at all, it means nothing less than the court must "engage[ ] in the required analysis and select[ ] the appropriate

statutory criteria" before ordering sentences to be served consecutively. Only then will the imposition of consecutive sentences not be contrary to law.

*Wills* at ¶ 31.

**{¶ 54}** We should not infer nor cobble together findings. Here, a finding under R.C. 2929.14(C)(4)(b) addressing course of conduct was not made and should not be inferred.

Copies sent to:

Ryan C. Spitzer
James A. Anzelmo
Anthony C. Dowell
Hon. Jeannine N. Pratt