[Cite as *State v. Tejeda*, 2025-Ohio-1449.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                      :

    Plaintiff-Appellee,           :

                              No. 114097

    v.                            :

BRIAN TEJEDA,                       :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 24, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-685845-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Connor Davin, Assistant Prosecuting Attorney, *for appellee.*

Wegman Hessler Valore and Dean Valore, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Brian Tejeda ("Tejeda"), appeals his having a weapon while under disability conviction ("HWWUD"). He raises the following assignments of error for review:

**Assignment of Error I:** The court's verdict of guilt as to Count IV of the indictment charging [Tejeda] with [HWWUD] was not supported by sufficient evidence.

**Assignment of Error II:** The court's verdict of guilt as to Count IV of the indictment charging [Tejeda] with [HWWUD] was against the manifest weight of the evidence.

**Assignment of Error III:** The court's verdict of guilt as to Count IV of the indictment charging [Tejeda] with [HWWUD] is so inconsistent with the jury's verdicts that common sense demands an acquittal.

{¶ 1} For the reasons set forth below, we affirm Tejeda's conviction.

## I. Facts and Procedural History

{¶ 2} In October 2023, Tejeda was charged in a six-count indictment stemming from the shooting of D.J., who was 16 years old the time of offenses in 2023. Count 1 charged him with attempted murder; Counts 2 and 3 charged him with felonious assault; Count 4 charged him with HWWUD; Count 5 charged him with sexual imposition; and Count 6 charged him with retaliation.[1]

{¶ 3} The matter proceeded to a jury trial on Counts 1-3 and a bench trial on Counts 4-6. Tejeda was acquitted of all counts and specifications, except Count 6 — HWWUD. Because Tejeda challenges only his HWWUD conviction, our discussion will focus on the facts and law relevant to this count.

{¶ 4} The evidence at trial revealed that Tejeda, a registered sex offender, and D.J. knew each other through D.J.'s cousin ("Cousin"), who was staying with D.J. Tejeda was staying at his family's house, which was across the street from D.J.'s house on Newark Avenue in Cleveland. Tejeda, D.J., and Cousin hung out during

---

[1] Each of Counts 1-3 carried both one- and three-year firearm specifications.

the summer of 2023. The three of them would smoke and drink together. D.J. testified that initially Tejeda flirted with her Cousin but after Cousin left D.J.'s house, T.J. made an advance at D.J. According to D.J., on August 30, 2023, they were hanging out in Tejeda's car. Tejeda was drunk and touched her thigh. D.J. testified that she did not want him to touch her so she slapped his hand.

{¶ 5} During this timeframe, D.J.'s mother ("Mother") suspected Tejeda was older than D.J., who was 16 years old at the time, and did not want D.J. to hang out with him. Tejeda told D.J. and Mother that he was 19 years old, when he was actually 26 years old. Mother testified that, because of her suspicions, she told Tejeda to stop coming over to her house. Mother stated that "it started to become a point of contention" because Tejeda continued to come over. (Tr. 190.) According to Mother, they would have their windows open because it was summertime and Tejeda would "pop his head in the window" as the family spent time together in the kitchen. He also would approach D.J.'s window at three in the morning, asking to use the phone or a charger. When Mother would tell Tejeda not to come around, Tejeda would become antagonistic and tell Mother, "[Y]ou don't own the house." (Tr. 191.)

{¶ 6} According to Mother, on September 26, 2023, which was the day before the shooting, she observed Tejeda standing in her driveway "with a gun on his hip . . .[j]ust threatening, just basically threatening." (Tr. 192.) Tejeda also brandished multiple machetes and waved them around as he walked back and forth in front of her house. Tejeda then went back to his porch across the street and

continued showing off his weapons in a threatening manner.  Mother at first ignored these actions; however, when she left the house to walk the dog, Tejeda was still outside with the gun and machetes.  Mother took Tejeda's actions "seriously" and as a "threat." (Tr. 193.)  She stated, "[Tejeda was] making me think that [he was] trying to do something to me." (Tr at 193.)  Mother told him to stop, but Tejeda began to argue and again started walking back and forth in front of the house with his weapons.  Mother, who has a prior drug-trafficking conviction, returned inside her house, grabbed a gun, and came back outside.  She told Tejeda to stop, and they began to argue.  The situation eventually deescalated, and Tejeda left the area.

{¶ 7}  The next day, on September 27th, D.J. returned home sometime between 10:30 p.m.-11:00 p.m. after visiting her friend "Little Chris." (Tr. 222.)  D.J. testified that she backed into her parking spot in the driveway and as she leaned over to roll up the passenger-side window, she heard gunshots and ducked.  D.J.'s headlights, internal car light, and the porch light were on at that time.  When she looked up, she observed a tall man, whom she believed was Tejeda, dressed in all black and a ski mask in front of her car.  D.J. was able to observe brown eyes, dark skin, and curly, brown hair protruding through the mask.  D.J. also testified that the shooter was wearing a necklace that said "Jaylenne," which was the same necklace that Tejeda wore. (Tr. 242.)  The shooter then ran away, and Mother came outside.  D.J. was shot in her left thigh.  There were five bullet holes in the hood of the driver's side and one bullet hole in the driver's side door.

{¶ 8} Mother testified that she knew D.J. had returned home because the dogs were "swirling by the door" and she heard the car coming up the driveway. (Tr. 195.) As she stood up, she heard "pop pop pop pop pop." (Tr. 195.) She ran out the door to find D.J. in the driver's seat shot in the leg and "the whole car was just shot up basically in the front." (Tr. 197.) Mother then ran back into the house and grabbed her shoes and got into the car and drove D.J. to MetroHealth Hospital. Mother spoke with police at the hospital and told them that the suspect may be Tejeda who she knew as "Sosa." (Tr. 199.)

{¶ 9} Mother identified State's exhibit No. 100 as "the Instagram photo that I received from [Tejeda, which was] hours prior actually to the shooting in my driveway . . . right in front my house." (Tr. 202.) Mother proceeded to establish, based upon the content of the exhibit and a general knowledge of what Instagram is, that she believed it to be a photograph of Tejeda from an account bearing the username "Big Gucchi Sosa." (Tr. 203.) Mother testified that the photo depicted Tejeda in a "fake Louis Vuitton scarf with some sunglasses . . . a black sweater . . . [and] some red boxers[.]" (Tr. 204.) Additionally, Mother testified that Tejeda used to paint his fingernails black and that they were painted black in the photograph. Mother further testified that she believed the object sticking up on his right hip to be a gun. Mother showed this photograph to the investigating officers.

{¶ 10} D.J. also identified the Instagram username "Big Gucchi Sosa" as belonging to Tejeda. (Tr. 251.) D.J. testified that Tejeda was the individual in the photograph and he was wearing the "Jaylenne" necklace. (Tr. 252.) According to

D.J., Tejeda's outfit "was consistent with what he was wearing when he shot" her, except for the shoes, scarf on his head, and glasses. (Tr. 251.) D.J. further testified that she believed he had a gun in the side of his pants.

{¶ 11} On cross-examination, D.J. testified that she did not initially mention the "Jaylenne" necklace to the police when she was at the hospital. She was in shock and there was "a lot going on." (Tr. 268.) She did mention the necklace when police showed her the Instagram photograph during an interview after she was released from the hospital.

{¶ 12} We note that at the close of the State's case, Tejeda objected to the Instagram photograph (State's exhibit No. 100) on the grounds that it was not properly authenticated and could not be placed as taken six hours prior to the shooting. The trial court sustained the objection, noting that it was "not convinced that six hours means anything." (Tr. 406.) As a result, the Instagram photograph was not admitted into evidence.

{¶ 13} Second District Cleveland Police Detective Vasile Nan ("Det. Nan") testified that he was on patrol the night of September 27th because of personnel shortages at the department. Det. Nan responded to an alert from ShotSpotter that shots had been fired near Newark Avenue. According to Det. Nan, ShotSpotter is a technological tool that alerts police to the location where it detects gunfire. ShotSpotter corroborated the testimony that six shots were fired. When he arrived on the scene, he received information through his police radio that "a female victim who was being seen at Metro ER for a [gunshot wound] that was from that location

as well." (Tr. 288.) Det. Nan testified that he found five shell casings towards the rear of the house. D.J.'s friend, "Little Chris," came to the scene "very upset, saying his sister was shot. He just found out. He lives a few blocks away. And we were trying to gather information for the follow-up and at one point Chris provided the nickname of Sosa as the suspect." (Tr. 289-290.)

{¶ 14} Cleveland Police Detective William Mazur ("Det. Mazur") testified that he was assigned to the case. Det. Mazur interviewed D.J. and Mother together on October 2, 2023. Det. Mazur testified that D.J. identified Tejeda as the shooter and indicated she had "looked right at him." (Tr. 342.) According to Det. Mazur, D.J. selected Tejeda's photo out of a photo array with 100 percent certainty. D.J. also described the "Jaylenne" necklace the shooter was wearing. Det. Mazur testified to having collected the "Jaylenne" necklace from Tejeda's property bag at the county jail. Det. Mazur testified that no fingerprint or DNA evidence was collected or tested, Tejeda's residential addresses were never searched, and no gun was recovered. Det. Mazur emailed a search warrant to Facebook for the Instagram handle "Big Gucchi Sosa underscore," did not receive anything in response. (Tr. 352.)

{¶ 15} On cross-examination, defense counsel asked Det. Mazur if it would be important to know that D.J. did not identify the necklace when she was at the hospital. Det. Mazur replied that "[f]rom [his] experience, victims who have gone through a traumatic event, they have a tendency to not have a complete recollection of everything that occurred to them. So as time passes, sometimes they do start

recalling a little bit more information as time passes when they are a little less traumatized." (Tr. 360-361.) He testified that the Instagram screenshot was emailed to him and it did not include a date. He further testified that "[D.J.] was very adamant" Tejeda shot her. (Tr. 367.) According to Det. Mazur, D.J. told him that "was very clear . . . . Tejeda shot [her]. [She] immediately identified [Tejeda] by what he was wearing. [She] looked in his eyes. [She] saw his nose. [She]'d hung out with him for six straight weeks every single day. She knew exactly what he looked like, what he wore, what his hair looked like and they looked right in each other's eyes after he shot her." (Tr. 372.) Det. Mazur did not obtain D.J.'s cellphone records, nor did police test Tejeda's clothing for gunshot residue.

{¶ 16} Nicole Leligdon ("Leligdon") testified that she is employed by the State of Ohio, is considered a law enforcement officer, and has the power to investigate crimes and arrest suspects. Leligdon testified that she arrested Tejeda on September 28, 2023. She described Tejeda at the time of the arrest with a "bandanna [sic] head covering, sunglasses, a black face ski mask, his black/brown curly hair, black sweatshirt, red boxer shorts." (Tr. 387.) He also had a gold chain necklace around his neck. According to Leligdon, on October 16, 2023, she had another interaction with Tejeda, where she made him aware of the charges against him. In response, Tejeda stated, "I'm going to whack that b***h for what she did." (Tr. 394.)

{¶ 17} At the conclusion of trial, the jury found Tejeda not guilty of Counts 1-3 as well as the firearm specifications accompanying those counts. In the bench

trial, the court found Tejeda guilty of Count 4 (HWWUD) and not guilty of Counts 5 and 6. The matter was then continued for sentencing. At the sentencing hearing, the court imposed a sentence of 30 months in prison and up to two years of postrelease control. The court stated:

> As this court is very familiar with the facts, the state presented evidence to the jury. They did not believe the state beyond a reasonable doubt. But this court did find that at least on the first incident, September 27, the defendant did have a gun, whether it's from the Instagram post or the shooting itself.

(Tr. 510.)

{¶ 18} It is from this order that Tejeda appeals, raising three assignments of error for review.

## II. Law and Analysis

### Sufficiency of the Evidence

{¶ 19} In the first assignment of error, Tejeda challenges the sufficiency of the evidence with regard to his HWWUD conviction. Tejeda contends there was insufficient evidence to prove that any object he possessed was a working firearm.

{¶ 20} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 21} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 22} In *State v. Jones*, 2021-Ohio-3311, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 23} Tejeda was convicted of HWWUD in violation of R.C. 2923.13(A)(2), which provides in pertinent part: "[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person is under indictment for or has been convicted of any felony offense of violence[.]"

{¶ 24} Here, there is no dispute that Tejeda had been previously convicted of third-degree felony abduction in violation of R.C. 2905.02(A)(2) in 2016. Instead,

Tejeda's argument focuses on the contention that there was insufficient evidence to prove that he possessed a "firearm" as defined in R.C. 2923.11(B)(1), which states: "'Firearm' means any deadly weapon capable of expelling . . . one or more projectiles by the action of an explosive or combustible propellant [and] . . . includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." When determining whether a firearm is operable "'the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.' R.C. 2923.11(B)(2)." *State v. Jackson*, 2016-Ohio-4567, ¶ 12 (8th Dist.), quoting *State v. Knight*, 2004-Ohio-1941, ¶ 19 (2d Dist.) ("[B]oth a weapon's existence and its operability may be inferred from the facts and circumstances.") These representations and circumstances include "'any implicit threat made by the individual in control of the firearm.'" *State v. Crawford*, 2004-Ohio-500, ¶ 35 (8th Dist.), quoting *Thompkins*, 78 Ohio St.3d at 385.

{¶ 25} Tejeda argues that there is no evidence that the firearm was operable, nor were there any threats made by him to use a firearm. In making this contention, Tejeda acknowledges three possible sources of evidence that he possessed a firearm — Mother's testimony, the shooting itself, and the Instagram photo. Tejeda argues that Mother's testimony was insufficient and the Instagram photo was inadmissible and should not be considered as the basis to sustain the conviction. Tejeda does not address any of D.J.'s testimony regarding the shooting.

{¶ 26} We note that the jury's not guilty findings does not preclude the consideration of all evidence from the shooting. Tejeda chose to proceed with the HWWUD count to the bench and the remaining counts to the jury. The jury and the trial court are two independent triers of fact and may come to different conclusions using the same set of facts. *State v. Brown*, 2008-Ohio-1722, ¶ 23 (8th Dist.); *State v. Callahan*, 2018-Ohio-3590, ¶ 29 (8th Dist.) (defendant's HWWUD conviction not reversed even though jury acquitted him on all weapons-related charges).

{¶ 27} With regard to Tejeda's contention that the trial court improperly relied on the Instagram photo, which was not admitted into evidence, we note that "a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." *State v. Eubank*, 60 Ohio St.2d 183, 187 (1979), citing *State v. White*, 15 Ohio St.2d 146 (1968); *see also State v. Thompson*, 2020-Ohio-5257, ¶ 41 (8th Dist.). However, even without the Instagram photo, there is still sufficient evidence in the record to support Tejeda's HWWUD conviction by virtue of Mother's testimony and D.J.'s testimony.

{¶ 28} On the day before the shooting, Mother testified that she observed Tejeda standing in her driveway "with a gun on his hip . . .[j]ust threatening, just basically threatening." (Tr. 192.) Tejeda also brandished multiple machetes and waved them around as he walked back and forth. Tejeda then went back to his porch across the street and continued showing off his weapons in a threatening manner. Mother testified that she took Tejeda's actions "seriously" and as a "threat."

(Tr. 193.) She stated, "[Tejeda was] making me think that [he was] trying to do something to me." (Tr at 193.) Because Mother testified that Tejeda displayed the gun on his hip in a threatening manner, the trier of fact could have found that the gun was operable. Therefore, when viewed in a light most favorable to the State, Mother's testimony alone demonstrates beyond a reasonable doubt that on or about September 27, 2023, Tejeda did knowingly have, carry, or use a firearm.

{¶ 29} In addition to Mother's testimony, D.J.'s testimony is sufficient to sustain the HWWUD conviction. D.J. positively identified Tejeda as the assailant in her interviews with the police, the photo array, and at trial. She was clear that Tejeda shot her because she could see his unique necklace, tall stature, dark skin color, brown eyes, and "brown," "curly," and "poofy" hair extending through the slit of his mask. She was able to identify these characteristics because D.J.'s headlights, internal car light, and porch light were illuminated and Tejeda shot at her from close range.

{¶ 30} Based on the foregoing, when reviewing the evidence in a light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Tejeda did knowingly have, carry, or use a firearm on or about September 27, 2023.

{¶ 31} Therefore, the first assignment of error is overruled.

**Manifest Weight of the Evidence**

{¶ 32} In the second assignment of error, Tejeda argues that his conviction is against the manifest weight of the evidence because there was no evidence that

the object he was seen to possess was a firearm.  He contends that the circumstances of the shooting made his identification impossible and that D.J. "jumped to the conclusion" that he was the shooter because of his previous actions towards her.

{¶ 33} "[A] manifest weight challenge questions whether the prosecution has met its burden of persuasion."  *Bowden*, 2009-Ohio-3598, at ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390.  When reviewing a manifest-weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"  *State v. Virostek*, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).  A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'"  *Thompkins* at 387, quoting *Martin* at 175.

{¶ 34} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief.  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997).  Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.*  Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the

appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 35} This is not the exceptional case where the evidence weighs heavily against the conviction. While Tejeda attacks D.J.'s credibility, he does not demonstrate how the trial court clearly lost its way and created such a manifest miscarriage of justice. As discussed above, the evidence presented at trial reveals that D.J. identified Tejeda as the shooter in police interviews, a police lineup, and in court. Moreover, Mother testified that Tejeda was standing in her driveway with a gun on his hip and waving multiple machetes around as he walked back and forth in front her house. Indeed, "'a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 2015-Ohio-1950, ¶ 71 (8th Dist.), quoting *State v. Hall,* 2014-Ohio-2959, ¶ 28 (4th Dist.). Here, the court heard all the evidence and believed the State's version of the facts regarding the HWWUD count. Thus, based on the foregoing, we cannot say that Tejeda's conviction was against the manifest weight of the evidence.

{¶ 36} The second assignment of error is overruled.

**Inconsistent Verdicts**

{¶ 37} In the third assignment of error, Tejeda argues that the trial court's guilty verdict on the HWWUD count was inconsistent with, and contradicted by, the jury's not guilty verdict on the remaining counts and specifications.

{¶ 38} The Ohio Supreme Court has held that the counts of an indictment "are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, (1997), paragraph one of the syllabus. Moreover, "[e]ach count of a multi-count indictment is deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt." *State v. Eason*, 2016-Ohio-5516, ¶ 68 (8th Dist.); *see also Callahan*, 2018-Ohio-3590 (8th Dist.). As a result, this court has repeatedly rejected "inconsistent verdict" cases where the jury acquitted the defendant of the firearm specifications, but the trial court convicted the defendant of HWWUD. *See Eason* at ¶ 69 ("[T]he inconsistency between the jury's and the trial court's verdicts does not require reversal of appellant's conviction for [HWWUD]."); *Callahan* at ¶ 30 ("[T]he inconsistency between the jury's and the trial court's verdicts does not require reversal of Callahan's convictions for [HWWUD]."); *State v. Stevens*, 2016-Ohio-4699 (8th Dist.) (sufficient evidence found when the jury acquitted the defendant of firearm specifications but found the trial court found defendant guilty of HWWUD); *State v. Morris*, 2011-Ohio-824 (8th Dist.) (sufficient evidence found when the jury

acquitted the defendant of robbery and murder but the trial court found defendant guilty of HWWUD); *Brown*, 2008-Ohio-1722 (8th Dist.) (sufficient evidence found when the jury acquitted the defendant of attempted murder and felonious assault but the trial court found guilty of HWWUD).

{¶ 39} Tejeda acknowledges this, but argues that the "unique circumstances" exception acknowledged by this court in *State v. Schall*, 2024-Ohio-1896 (8th Dist.), applies. In *Schall*, the defendant argued that the trial court erred as a matter of law by convicting him of HWWUD based on the same evidence the jury used to acquit him of crimes involving the possession and use of a firearm. This court affirmed his conviction, finding that this was not "a case in which 'a single issue' was sent to the jury that 'negated an element' of the offense tried by the trial court." *Id.* at ¶ 29, citing *State v. Lett*, 2005-Ohio-1308, ¶ 39-46 (8th Dist.). In reaching this conclusion, this court distinguished the "unique circumstances" exception set forth in *State v. Cordle*, 1985 Ohio App. LEXIS 5446 (10th Dist. Jan. 8, 1985).

{¶ 40} In *Cordle*, the parties stipulated that the defendant did not have a valid license, so the sole issue decided by the jury was whether the defendant had actually operated the motor vehicle when considering a charge of operating a motor vehicle without an operator's license. The jury acquitted the defendant on that charge; however, the trial court found the defendant guilty of operating a motor vehicle without reasonable control. The Tenth District Court of Appeals reversed the conviction, finding that

where a single issue is sent to the jury, and this issue negates an element of the offense simultaneously tried to the court, the trial judge must defer to the finding of the jury on that issue so as to preserve that issue for jury trial and to preclude a later judgment contrary to the jury verdict. The effect of this holding would prevent inconsistent verdicts, a principle of *res judicata*, and promote integrity in the jury system. Furthermore, trying the offenses simultaneously provides for judicial economy since the underlying facts arise from the same transaction and preserves the right to a jury trial on issues in offenses where such a right exist.

(Emphasis in original) *Id*. at *6.

{¶ 41} The *Cordle* Court indicated that "unique circumstances" were present because "the only issue tried to the jury on the no operator's [license] charge was whether [the defendant] 'operated the motor vehicle.'" That issue was "also an element of the offense tried to the court and the identical conduct forms the basis for both offenses." *Id*. at *5. The court noted, however, that "[i]t is only where the issue is identical in both cases tried to the court and jury that the judge must defer to the jury's verdict." *Id*. at *6-7.

{¶ 42} Tejeda argues that like *Cordle*, the jury's not guilty verdict on the other counts and the firearm specifications in his case should negate his guilty finding on the HWWUD count because the only logical conclusion concerning the jury's verdict is that the jury found that the State did not prove beyond a reasonable doubt that Tejeda was the shooter. According to Tejeda, these two verdicts cannot logically coexist. We disagree.

{¶ 43} Tejeda does not meet the "unique circumstances" requirements in *Cordle* because this is not "a case in which 'a single issue' was sent to the jury that

'negated an element' of the offense tried by the trial court." *Schall,* 2024-Ohio-1896, at ¶ 29, citing *Lett,* 2005-Ohio-1308, at ¶ 39-46 (8th Dist.). In *Lett,* this court found *Cordle* to be distinguishable because "the offense of having a weapon while under a disability and the firearm-specification charges involve different elements and the conviction of one does not preclude the conviction of the other." *Id.* at ¶ 41. Similarly, this case involved a different charges heard by different factfinders, at Tejeda's request. The jury, as the trier of fact on all other counts and specifications, was not convinced beyond a reasonable doubt that Tejeda was the shooter. The trial court, however, as the trier of fact on the HWWUD count, found that Tejeda possessed the firearm and used it. This inconsistency pertains to separate and distinct counts in the indictment and does not fall within the "unique circumstances" exception.

{¶ 44} Therefore, we find that the inconsistency between the jury's and the trial court's verdicts does not require reversal of Tejeda's HWWUD conviction.

{¶ 45} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

LISA B. FORBES, P.J., and
ANITA LASTER MAYS, J., CONCUR